No. 84,292

AUDRA NICHOLE NOLD, a minor, by and through her Parents, Natural Guardians, and Next Friends, Joseph C. Nold and Bonnie B. Nold, *Plaintiff/Appellee*, v. KERNIE W. BINYON, M.D., ERIC PEKARSKI, D.O., and PHILIP C. JAMES, M.D., *Defendants*, and MICHAEL P. BROWN, M.D., JAMES M. DONNELL, M.D., and SCOTT E. MOSER, M.D., *Defendants/Appellants*, and HCA HEALTH SERVICES OF KANSAS, INC., a Kansas Corporation, d/b/a WESLEY MEDICAL CENTER, *Defendant/Appellee*.

(31 P.3d 274)

Opinion filed September 21, 2001.

*Christopher A. McElgunn*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, argued the cause, and *Gary M. Austerman* and *Mary T. Malicoat*, of the same firm, were with him on the briefs for appellant Scott E. Moser, M.D.

*Stephen L. Brave*, of Turner & Boisseau, Chtd., of Wichita, argued the cause, and *Eldon L. Boisseau* and *Bobby J. Heibert, Jr.*, of the same firm, were with him on the brief for appellant Michael P. Brown, M.D.

*Harold S. Youngentob*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, argued the cause, and *Laura B. Lawson*, of the same firm, was with him on the briefs for appellant James M. Donnell, M.D.

*John H. Gibson*, of Boyer, Donaldson & Stewart, L.L.P., of Wichita, argued the cause, and *Michelle M. Watson*, of the same firm, was with him on the brief for appellee Wesley Medical Center.

*Arden J. Bradshaw*, of Bradshaw, Johnson & Hund, of Wichita, argued the cause, and *James R. Howell*, of the same firm, was with him on the brief for appellee Audra Nold.

The opinion of the court was delivered by

Six, J.: This first impression medical malpractice action arises from the pregnancy of Bonnie Nold and the later birth of her daughter Audra Nold. Joseph and Bonnie Nold, Audra's parents, on her behalf, alleged that certain physicians and a hospital were negligent in their care and treatment of Bonnie and Audra. We consider, in a managed care environment, the duty owed by the mother's physicians and the delivery hospital to the baby of a mother who intends to carry the fetus to term. We also consider the reporting responsibilities of physicians whose pregnant patient tests positive for hepatitis B.

Bonnie is not asserting a personal claim for damages. The jury returned a verdict for Audra and awarded damages totaling $800,000, apportioning negligence as follows: Dr. Scott Moser, 90 percent; Dr. James Donnell, 6 percent; Dr. Michael Brown, 2 percent; and Dr. Kernie Binyon, 2 percent. Three of the physician defendants, Drs. Moser, Donnell, and Brown, appeal. At the close of Audra's case, defendant HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center (Wesley), was dismissed on its motion for judgment as a matter of law. See K.S.A. 2000 Supp. 60-250 (formerly motion for directed verdict). The jury assessed zero fault to Eric Pekarski, D.O.; Katie Mroz, M.D.; Philip C. James, M.D.; and "unknown physician." Mroz and the "unknown physician" were not defendants; James' motion for summary judgment was granted before trial.

Our jurisdiction is under K.S.A. 20-3017 (the defendants' motion to transfer was granted).

We reverse, set aside the jury's verdict, and remand for a new trial. The district court erred in excluding certain expert testimony regarding the comparative fault of Wesley and in sustaining Wesley's K.S.A. 2000 Supp. 60-250 motion for judgment as a matter of law. We also disapprove the submission of an overly broad jury instruction setting forth a physician's reporting duty to: (1) other physicians and the hospital, (2) public agencies, and (3) the pregnant patient, as well as the length of time that duty would continue.

Because of our reversal and remand we need not reach the following additional issues raised on appeal by the physician defendants: Did the district court err: (1) in allowing certain claims for future medical care and treatment to be submitted to the jury; (2) in allowing a claim for future lost wages, loss of earning capacity, loss of career opportunity, and employment disability to be submitted to the jury; and (3) by precluding the doctors from comparing the fault of Bonnie? The evidence underlying the district court's decision on these issues may be subject to change. Defendant Moser also asks us to evaluate this case as if it were a "loss of chance" case. The case had neither been framed nor tried as a loss of chance case; thus, this issue is not properly before us. See *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 622, 938 P.2d 1293 (1997).

## INTRODUCTION

The focus of all of Audra's claims is on the failure to notify Bonnie of her hepatitis B status and to administer gamma globulin and vaccine treatment to Audra at the time of her birth. While pregnant, Bonnie was treated by numerous physicians. Laboratory test results obtained early in her pregnancy showed she was a carrier of hepatitis B, although she was asymptomatic and experienced no related health problems. A carrier, during pregnancy and delivery, can pass hepatitis B to her child. That happened here. Audra did not receive the necessary preventive treatment and has tested positive for the presence of hepatitis B surface antigens and is a chronic carrier. As of trial, she had none of the identifiable risk factors for more severe stages of hepatitis B and had remained

asymptomatic and without physical problems related to her status as a carrier.

## FACTS

In order to better understand the parties' contentions, and because Audra's claims arise within the current environment of managed care, we set out the facts in detail. We understand there is no universally accepted definition of "managed care." See Stephen M. Fatum, *Managed Care*, in Health Care Law Desk Reference § 501, p. 59 (Alison Barnes *et al.* eds., 2001). We use the term here to reflect Bonnie's referrals by her primary care physicians to specialists under her Equicor Health Plan, Inc., and to the specialists' referrals to and/or use of the primary care physicians for specific tests and lab work.

In February 1990, Bonnie was under the care of Dr. Kernie Binyon, a family practice physician. She became pregnant and was referred by Dr. Binyon to Dr. Michael Brown, a board-certified obstetrician and gynecologist. On February 12, 1990, during Bonnie's first visit, Dr. Brown ordered laboratory tests, including one for hepatitis B. Those orders were given to Bonnie, who took them to Dr. Binyon's office. Dr. Binyon's staff drew blood samples and transmitted them to a laboratory for testing. The laboratory sent the results to Dr. Binyon's office, which then sent them to Dr. Brown. Included in the test results was a report dated February 20, 1990, which showed that Bonnie tested positive for hepatitis B. Neither Dr. Brown nor Dr. Binyon informed Bonnie of the results of this test.

During Bonnie's second visit to Dr. Brown, he requested a sonogram because he believed her growth was a bit abnormal. Due to managed care insurance constraints, Dr. Brown had to have a referral from Dr. Binyon. Dr. Binyon refused to provide the sonogram referral. Dr. Brown elected to terminate his doctor-patient relationship with Bonnie, still in her first trimester of pregnancy, because he said he could not properly treat her without conducting tests he believed necessary to protect her health and the health of the developing fetus.

Bonnie then sought the care of another physician. She first terminated her doctor-patient relationship with Dr. Binyon and requested that he forward her medical records to Dr. James Donnell. On March 30, 1990, Dr. Donnell became Bonnie's primary care physician under her Equicor Health Plan. Sometime between March 30, 1990, and May 22, 1990, Dr. Binyon's office delivered Bonnie's medical records to Dr. Donnell. Included within those records was the laboratory test result on Bonnie's positive hepatitis B status. Shortly after March 30, 1990, Dr. Donnell, a family practice physician who had chosen to limit his practice to nonobstetrical cases, referred Bonnie to Dr. Scott Moser for obstetrical care.

Despite the referral to Dr. Moser, Bonnie visited Dr. Donnell's office five times before giving birth to Audra: (1) March 30, 1990; (2) May 22, 1990, for lab work requested by Wesley Family Practice/Dr. Moser; (3) July 2, 1990, for additional lab work; (4) July 17, 1990, for RhoGAM shots ordered by Wesley Family Practice/Dr. Moser; and (5) August 21, 1990, for more lab work ordered by Wesley Family Practice/Dr. Moser. Dr. Donnell never reviewed the hepatitis B test result nor advised Bonnie or later health care providers of her hepatitis B status.

Dr. Moser, a physician certified in family practice, made obstetrics an active part of his practice. He first saw Bonnie on April 11, 1990, when she was 18 weeks pregnant. On that visit Dr. Moser decided that a sonogram would be helpful and requested her medical records from Dr. Brown. After Dr. Moser received the medical records, he noted and entered the hepatitis B information in Bonnie's chart. Dr. Moser's standard practice in the care of hepatitis B positive pregnant women is to enter the information at a prominent place in the medical record. He does this so that at the time of delivery anyone involved in the mother's care will be aware of her hepatitis B status and ensure that the child receives appropriate treatment. He testified that he believed he entered the information sometime after the initial visit on April 11, 1990, and before Bonnie's May 16, 1990, visit. Dr. Moser testified that he recalled telling Bonnie about her hepatitis B status and advising her of the implications it would have for her fetus, but he was not sure when the conversation took place. Bonnie testified Dr. Moser did not tell

her about her positive hepatitis B test or its implications for the fetus.

Dr. Moser testified that a patient's prenatal records are customarily sent to the delivering hospital at about 34 to 36 weeks' gestation. In 1990, the labor, delivery, and recovery unit (LDR) at Wesley had an established policy and procedure. Once prenatal records were received from a patient's physician, they were sent directly to the LDR and placed in alphabetical order in a filing cabinet. The records were filed by the unit clerks as the records came into the unit. When the patient was later admitted to the hospital, the unit clerk would retrieve the patient's prenatal history from the filing cabinet, put it with the chart that was being assembled upon admission, and deliver the chart to the physician who was handling the labor and delivery.

Wesley would stamp all records within a chart with "address-o-graph" information. The address-o-graph stamp included the patient's hospital stay number, name, birthday, date of admission, and the date Wesley received the record. This procedure ensured that such information was on every piece of permanent record within the hospital and that the information would follow the patient through the course of her care and treatment at Wesley.

Bonnie's prenatal records from Dr. Moser were stamped with an address-o-graph, showing that Wesley received the records. However, the only date that appeared in the address-o-graph information was Bonnie's September 14, 1990, admission date. At trial, Wesley personnel testified that, despite the professed practice of stamping records with the date they are received, the information concerning the receipt of the records is inaccurate and unreliable.

The last entry on the copy of Dr. Moser's prenatal records from the hospital file was made on August 30, 1990. The original prenatal records maintained by Dr. Moser in his office contain a later entry made on September 11, 1990. It is therefore likely that the prenatal records from Dr. Moser were sent to Wesley sometime before September 11, 1990.

After a baby is born, Wesley's standard practice is to place information in the mother's chart in the medical chart for the baby.

Dr. Moser expected the standard practice to occur in Bonnie and Audra's case. He assumed that the hepatitis B information would find its way in a timely manner to the appropriate caregivers for Audra, including her designated pediatrician. The pediatrician could then provide Audra with appropriate care and treatment to prevent hepatitis B transmission.

In 1990, Dr. Eric Pekarski was a resident physician at Wesley training to become a specialist in family medicine. He is now board certified in Family Practice. During his residency, he practiced under the supervision of residency program faculty members. On the night of September 14, 1990, between 9:40 and 10 p.m., Dr. Pekarski was called to the LDR. Dr. Pekarski examined Bonnie, determined she was in active labor, contacted his attending physician, Dr. Katie Mroz, and agreed with Dr. Mroz that Bonnie should be admitted.

In admitting a patient, as part of his duties as a resident, Dr. Pekarski completed a Resident Admission Note consisting of the patient's history. Included within the Resident Admission Note is a section for major medical illnesses. The resident doctor obtains the information to complete that section by asking the patient. Dr. Pekarski followed his general practice of completing the Resident Admission Note and then delivering it to the unit clerk to be placed in Bonnie's chart. Dr. Pekarski did not review Dr. Moser's prenatal records when filling out the Resident Admission Note.

It was Dr. Pekarski's practice to check in with his attending physician when he was providing care to a patient. Dr. Mroz, a physician in Dr. Moser's office, was on weekend call for Dr. Moser on that particular Friday night. Dr. Pekarski's practice of consulting with the attending physician was intended at least in part to find out any information about risk factors, including any information in the prenatal records. Thus, Dr. Mroz played a role in the process of putting together the chart for Bonnie.

Dr. Moser arrived at the hospital at 11:06 p.m. By the time Dr. Moser arrived, Bonnie was already in the delivery room, the baby was having distress, and delivery was imminent. The fetal heart tones were dangerously slow, suggesting that the baby's health might be compromised and that the baby's condition was not im-

proving. Because of the emergency situation, Dr. Moser immediately focused on the distressed baby and did not review Bonnie's prenatal records. Forty-four minutes after Dr. Moser's arrival, Audra was delivered by Cesarean section, and Dr. Moser helped with the efforts to resuscitate her.

In emergencies such as Bonnie's, Dr. Moser and other physicians rely on the records system to make sure that the transfer of information from the mother's prenatal records to the baby's chart takes place. As part of this record transfer system, Dr. Moser relied primarily on Dr. Mroz and Dr. Pekarski. Dr. Mroz remained at the hospital through the delivery despite Dr. Moser's arrival and was actively involved in the delivery.

Dr. Moser testified that typically he is both the mother's doctor and the baby's doctor. As the baby's doctor, he would order the hepatitis B inoculation and vaccination needed by the baby of a hepatitis B positive mother. However, in this instance, Dr. Pekarski was covering for the baby's designated pediatrician, Dr. Phillip James. Thus, Dr. Moser did not order postdelivery treatment for Audra.

Dr. Pekarski handled Bonnie's discharge from the hospital on September 7, 1990. On October 9, 1990, he dictated a discharge summary, reviewing her medical chart in its entirety. Dr. Pekarski's discharge summary did not contain information either that Bonnie is hepatitis B positive, or that Audra was born to a hepatitis B positive mother. At trial, Dr. Pekarski testified that Dr. Moser's prenatal records were not in Bonnie's hospital medical chart at the time she presented to the LDR, when he reviewed it while providing her care, or at the time he dictated her discharge summary.

It is recommended that a gamma globulin injection be given to an infant exposed to hepatitis B within the first 12 hours after birth. However, the gamma globulin treatment is still effective if administered up to and perhaps beyond 2 days after birth. The hepatitis B vaccine is also given to such a baby within the first week of life. When this treatment is administered, there remains a 10 percent chance that the newborn will contract hepatitis B.

In 1992, Bonnie underwent a hysterectomy. During the procedure, a nurse was stuck with a needle that had been used on Bon-

nie. As a result, Bonnie's blood was tested again. She was advised that she had tested positive for hepatitis B, that it was an infectious disease obtained through intimate contact, and that she should have her family tested. Afterward, Audra was tested and found to be hepatitis B antigen positive.

## DISCUSSION
### The Comparative Fault of Wesley Medical Center

The physician defendants contend the district court erred by excluding the testimony of Audra's expert, John Bundren, M.D., on the breach of the standard of care by Wesley's nurses. See K.S.A. 60-258a (comparative negligence). The district court found Dr. Bundren was not qualified to testify on the nursing standard and granted Wesley's motion for judgment as a matter of law at the close of Audra's case because of the lack of expert testimony. We agree with defendants.

The admission of expert testimony lies within the discretion of the district court, and its decision will not be reversed on appeal absent a showing of abuse of discretion. *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, 762, 915 P.2d 86 (1996).

Wesley filed a motion in limine, requesting that the district court exclude the testimony of Dr. Bundren concerning nursing standards. Wesley points out that the limine motion, the supporting trial brief, and its motion to strike Dr. Bundren as an expert on nursing standards are not included in the record on appeal. According to Wesley, these submissions are "vital" to our review, and the appellants carry the burden to include them in the record on appeal. The appellants bear the burden to compile a record sufficient to support their arguments, not those of their opponents. Wesley had the opportunity to request additions to the record to support its arguments. See Supreme Court Rule 3.02(c) (2000 Kan. Ct. R. Annot. 21). It also had the ability to address arguments it advanced below in its appellate briefs. We conclude the question is properly before us on the record as it stands.

The defendants argue that Dr. Bundren's more than 20 years of experience as an obstetrician/gynecologist in labor and delivery qualified him to testify on the standards applicable to nurses in

labor and delivery units, particularly with respect to the review and maintenance of chart information on patients' infectious diseases. Dr. Bundren testified he had "[w]orked with . . . nurses on a daily or weekly basis in multiple sites across the country." He answered "yes" to the following question from Audra's counsel: "Before I ask your opinions are you knowledgeable concerning the general standard for how nurses in a labor and delivery unit would handle prenatal records coming in from a doctor from the point of being received and getting into the chart?"

K.S.A. 60-419 says in part:

"As a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof, or experience, training or education if such be required. Such evidence may be by the testimony of the witness himself or herself."

K.S.A. 60-456(b) says:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

A further review of Dr. Bundren's qualifications is appropriate. He is on the faculty of the University of Oklahoma College of Medicine, in the Department of Gynecology and Obstetrics. He is a board certified OB-GYN specialist and a tenured associate professor. He does a substantial amount of private practice. His focus currently is on the hospital's infertility patients. He is actively involved in teaching the 16 OB-GYN residents who work with him in the operating room and in his private practice office in the hospital. It is not uncommon for him to spend weekends in the hospital with residents delivering babies and managing obstetrical complications and problems. He sees private patients in his office and probably delivers the babies of 20 private patients a year. He is involved in about 200 deliveries a year as a resident supervisor or helper, and it has been that way for many years. He is familiar with high-risk obstetrical situations. He teaches residents about how to handle obstetrical situations and problem patients on a weekly basis

in the clinic with patients. He has published and does research. He attends meetings of the American College of Obstetrics and Gynecology, which promotes national standards to make obstetrical care safe across the country. In his dealings with pregnant women over the years, he has considered the hepatitis B problem.

Dr. Bundren also has been involved with teaching nurses. He has given numerous lectures to nurses and worked with them on various aspects of patient care in hospitals. He is on the staff of various medical centers in Tulsa and is familiar with labor and delivery unit standards for handling patient records as they come in and are put into patients' charts.

The critical passage in the proffer of Dr. Bundren's testimony reads:

"Q. . . . [D]id you form an opinion as to whether the labor or any of the labor and delivery nurses at Wesley were negligent in any respect and fell below the standard acceptable nursing practice?

"A. I did form an opinion.

"Q. And what is that opinion?

"A: My opinion is that the nurses failed to follow their own policies and procedures. They failed to adequately assess the patient and document on their nurses assessment that the patient was hepatitis B surface antigen positive and failed to transmit that information on to the nursery nurses which is the usual means by which that information is moved around.

"Q. You're referring to that nursing admission assessment?

"A. I'm referring to the nursing admission assessment and the documents and testimony that I became aware of.

"Q. Can you tell us whether the nurses doing that function, that is adding the hepatitis B information from the prenatal record to the nursing assessment records, would be a standard thing for nurses to do?

"A. That would be a very standard thing for nurses to do.

"Q. You hold those opinions to a degree of medical probability?

"A. Yes, sir."

Dr. Brown joined in the proffer, and this preserved the issues of Dr. Bundren's testimony and Wesley's dismissal for our review. The district judge excluded Dr. Bundren's testimony because he viewed Dr. Bundren as a physician who merely worked around nurses and not as one who possessed actual nursing expertise. We hold the district court erred as a matter of law in excluding Dr. Bundren's testimony on the general standard of care commonly

applicable to nurses in labor and delivery units, particularly with respect to the review and maintenance of prenatal chart information.

We visited the medical expert nursing standard of care question in *Avey v. St. Francis Hospital & School of Nursing,* 201 Kan. 687, 422 P.2d 1013 (1968). *Avey* supports defendants' contention that the district court abused its discretion in excluding Dr. Bundren's testimony. In *Avey,* we considered whether a physician was qualified to testify to nursing standards and hospital procedures. Avey's expert, Dr. Robert Stein, testified that he was a licensed physician practicing medicine in Kansas, Massachusetts, and California and that he was familiar with the nursing care standards and practices at issue in the case. Although he had not practiced in Wichita, Dr. Stein testified that he was familiar with the practices of St. Francis Hospital and with nursing care in general in the community. We reversed the district court's exclusion of Dr. Stein's testimony. 201 Kan. at 692-93. Wesley argues that *Avey* is distinguishable on the facts because the challenge to Dr. Stein's testimony was based on the "locality rule." See 201 Kan. at 690-91. Dr. Bundren's testimony was challenged on the basis of his qualifications. We acknowledge the factual distinction; however, we extend the discussion in *Avey* surrounding a physician testifying as an expert on nursing standards to the situation here. See *Chandler v. Neosho Memorial Hospital,* 223 Kan. 1, 574 P.2d 136 (1977) (following *Avey*); *Moore v. Francisco,* 2 Kan. App. 2d 526, 583 P.2d 391 (1978) (in a malpractice action against an orthopedic surgeon, it was error to exclude an anesthesiologist from testifying on the standard of care in taking a patient's personal history, a matter common to all areas of medicine).

Wesley cites *Hall v. Sacred Heart Med. Ctr.,* 100 Wash. App. 53, 995 P.2d 621, *rev. denied* 141 Wash. 2d 1022 (2000), and *Haney v. Alexander,* 71 N.C. App. 731, 323 S.E.2d 430, *cert. denied* 313 N.C. 329 (1985), to support its contention that Dr. Bundren was not qualified to testify regarding nursing standards. These citations are puzzling, as the cases seem to support the defendants' contention that Dr. Bundren's testimony should have been admitted.

In *Hall*, the defendant hospital sought to have a doctor, who was codirector of the hospital, testify regarding the standard of care for critical care nurses. Hall objected on competency grounds. The hospital elicited testimony showing that the doctor worked with ICU nurses on a daily basis, was involved in the education and training of nurses, and was involved with the supervision of critical care nurses. On appeal, Hall asked the appellate court to establish a bright line rule stating that only a nurse could testify as to the standard of care of another nurse. The *Hall* court refused and found the district court had properly admitted the doctor's testimony. See 100 Wash. App. at 59-60.

The *Haney* court approved the testimony of two physicians who testified as experts on the nursing standards of care of the defendant hospital. Haney demonstrated one doctor had day-to-day dealings with registered nurses; taught nursing students in a clinical setting; and had worked with nurses who had comparable training, experience, and degree qualifications as the nurses who treated the plaintiff. 71 N.C. App. at 735-36. Haney's other expert also taught and worked with nurses of comparable training and experience. 71 N.C. App. at 736.

Wesley cites *Cox v. Lesko*, 23 Kan. App. 2d 794, 935 P.2d 1086 (1997), *aff'd in part and rev'd in part on other grounds*, 263 Kan. 805, 953 P.2d 1033 (1998), for the proposition that an expert cannot draw upon his or her personal experience alone to formulate his or her opinion. This reliance is misplaced. *Cox* found it improper for a doctor to testify regarding his or her own preferred method of treatment in determining whether another doctor deviated from the appropriate standard of care. 23 Kan. App. 2d at 798-99. *Cox* said: "The mere fact that one doctor prefers one method over another does not, by itself, mean that approach is better or preferable to the other." 23 Kan. App. 2d at 798. *Cox* is not persuasive here.

Dr. Moser cites K.S.A. 60-3412, which addresses the standard of care for a practitioner of the healing arts. K.S.A. 60-3412 is not applicable here. "A nurse is commonly understood, as reflected in our statutory definition of nursing, to be a person who works in the same area as and *under the supervision* of a physician or other

practitioner of the healing arts." (Emphasis added.) *State Bd. of Nursing v. Ruebke*, 259 Kan. 599, 627, 913 P.2d 142 (1996). A nurse is not a practitioner of the healing arts. K.S.A. 65-2872(m).

We have no hesitation in holding that Dr. Bundren was qualified to testify regarding nursing standards and their breach. He has extensive experience working in hospital labor and delivery units and is familiar with the standards and practices applicable to nurses working in these units. He testified that he worked on a "daily or weekly basis in multiple sites across the country." Dr. Bundren had also taught nurses and worked with them on various aspects of patient care in the hospitals. His testimony was well within the scope of his "special knowledge, skill, experience or training," as required by K.S.A. 60-456(b). Thus, the district court erred in excluding his expert testimony regarding nursing standards.

Assuming Dr. Bundren's testimony on retrial is as advertised, we also agree with Drs. Moser and Brown that the jury should be permitted to compare Wesley's alleged negligence. The district court's decision on Wesley's K.S.A. 2000 Supp. 60-250 motion for judgment as a matter of law, dependent as it was on the absence of Dr. Bundren's testimony, also was error. See *Morris v. Francisco*, 238 Kan. 71, 74, 708 P.2d 498 (1985). Reasonable minds might differ on the existence or extent of Wesley's liability, making judgment as a matter of law unavailable. The physician defendants are not precluded from making this argument because Dr. Brown joined in the proffer of Dr. Bundren's testimony; there was no agreement among all parties to allow Wesley's dismissal; and all defendants included Dr. Bundren in their witness lists by incorporating Audra's witness list. This situation is distinct from those in *Cantrell v. R.D. Werner Co.*, 226 Kan. 681, 602 P.2d 1326 (1979), and *Haberer v. Newman*, 219 Kan. 562, 549 P.2d 975 (1976). Here, there was evidence to support a breach of the Wesley nurses' standard of care and no acquiescence by defendants in the result of Wesley's motion.

Instruction Number 15 on Physicians' Duties and Negligence

Audra filed a motion for partial summary judgment, in which she asked the district court to rule that, as a matter of law, the

physician defendants providing medical care and treatment to Bonnie while she was pregnant with Audra also owed Audra a continuing duty of care. The district court, observing that the issue of a physician's duty to the fetus of a pregnant woman intending to carry to term was one of "staggering proportions," entered an extensive ruling in Audra's favor on the record. That ruling, which the district court characterized as a "new rule of law," was the precursor to jury Instruction No. 15, which read:

"The Court has ruled that there are standards that all physicians had to follow in providing care and treatment to Bonnie and Audra Nold. These standards have been set by the Court and *no expert testimony is necessary to establish them.* They are as follows:

"1. When a physician undertakes health care or treatment for the condition of a woman's pregnancy, including without limitation prenatal, labor or delivery care, duties are assumed by the physician for reasonable health care of the fetus or unborn child. When a physician has knowledge or should have knowledge of the mother's communicable disease, which probably is communicable to the unborn child during delivery, and which communication to the child probably could have been avoided by inoculation upon birth, he has a duty to:

a. advise other known health care providers furnishing the same or related care;

b. advise public agencies charged by law to be so advised; and

c. advise the pregnant mother of the communicable disease and its consequences thereby arming her with the knowledge of the need for inoculation.

"The physician who has knowledge or should have knowledge of the mother's communicable disease is not excused from these legal duties just because another physician assumes primary care in his place.

"2. The duty to Audra, the unborn child, arose from the physicians' duties to the pregnant expectant mother, Bonnie Nold. Those duties are to review all medical records received, or that should have been received, and report all unfavorable test results.

"3. The aforementioned duties of the physicians extend from the time of the initiation of the medical care relationship through the time for the effective inoculation of the baby following birth.

"A physician's deviation from these duties is negligence." (Emphasis added.)

Defendants argue that Instruction No. 15 was in error because it outlined a duty that was overbroad in scope and time and because it failed to factor in expert testimony to establish a breach of duty or negligence. We agree on both counts and note other complications.

In reality, Instruction No. 15 contained several "new legal rules" that require our attention. It made an exception to the requirement of expert testimony to establish negligence. It held that a doctor who undertakes the duty to care for a pregnant woman who intends to carry to term necessarily undertakes a duty to care for her fetus. When the pregnant woman may transmit a communicable disease during labor and delivery, it extended the duty to the fetus beyond birth and beyond termination of the doctor-patient relationship that gave rise to the duty in the first place and beyond a referral to a specialist or other provider. The district court held the duty did not terminate until preventive measures were taken. The court specified that the duty to the fetus included reviewing all of the pregnant woman's medical records that are or should have been received and notifying other health care providers, public agencies, and the pregnant woman of the communicable disease. Before this case can be retried, we must address each of these new rules.

## Necessity of Expert Testimony to Prove Negligence

The standard of medical or hospital care which is to be applied in any given case is not a rule of law, but a matter to be established by the testimony of competent medical experts. *Chandler*, 223 Kan. at 5. In order for Audra to recover damages, she was required to prove all the elements of a medical malpractice case: (1) The physicians owed her a duty of care and were required to meet or exceed a certain standard of care to protect her from injury; (2) the physicians breached this duty or deviated from the applicable standard of care; and (3) she was injured and her injury proximately resulted from the physicians' breach of the standard of care. See *Delaney v. Cade*, 255 Kan. 199, 202-03, 873 P.2d 175 (1994). The question of whether a duty exists is a question of law. *Glassman v. Costello*, 267 Kan. 509, 521, 986 P.2d 1050 (1999). But negligence is never presumed, *Schmidt v. HTG, Inc.*, 265 Kan. 372, 382, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998), and "may not be inferred merely from a lack of success or an adverse result from treatment. [Citation omitted.] The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the [plaintiff's] injury." *Ba-*

*con v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988). Expert medical testimony is ordinarily required. *Delaney v. Cade*, 255 Kan. 199, 211, 873 P.2d 175 (1994).

We believe the expert testimony requirement in medical malpractice cases is particularly apt in the current managed care environment, populated as it is by family practice "gatekeepers" and the specialists to whom they refer patients for care and from whom they receive referrals for more routine tests and procedures. We are aware this arena is not static. As a common-law court we need to turn a receptive ear to societal changes while safeguarding traditional tort concepts that exist to protect injured persons. Affirmance of the district court's Instruction No. 15 as written, with its relaxation of the expert testimony requirement, would cast a long precedential shadow of liability over health care providers, particularly those who function merely as links in a referral chain required by today's version of managed care.

Existence and Parameters of Physicians' Duties to a Fetus

Defendants acknowledge that a doctor owes a duty of care, *i.e.*, must meet or exceed the standard of care applicable to a given patient, once he or she establishes a doctor-patient relationship. Dr. Donnell disputes the district court's holding as a matter of law that a physician who establishes a doctor-patient relationship with a pregnant woman who intends to carry to term also establishes a doctor-patient relationship with the fetus, particularly as applied to a referring primary care physician like himself. Drs. Moser and Brown do not deny they had duties to Audra; however, they argue their duties ended when their doctor-patient relationship with Bonnie terminated.

The first portion of the district court's holding does not trouble us in the abstract. To the extent a pregnant woman desires to continue her pregnancy and deliver a healthy baby at its conclusion, her interest in receiving adequate health care is inevitably intertwined with any interest or potential interest of her fetus. In such a situation, the patient cannot be separated from her pregnancy nor her pregnancy from herself. We need not look beyond this incomparable relationship that is the genesis of the human condi-

tion. The mother who wishes to carry her pregnancy to term looks to her physician to guide her through her pregnancy, with the ultimate goal of the delivery of a healthy infant. Childbirth involves a universally recognized unique relationship between mother and child.

Other jurisdictions have recognized the relationship between a physician and a pregnant patient and her fetus. See *Hughson v. St. Francis Hosp.*, 92 App. Div. 2d 131, 132, 459 N.Y.S.2d 814 (1983) (finding "it is now beyond dispute that in the case of negligence resulting in prenatal injuries, both the mother and the child *in utero* may each be directly injured and are each owed a duty, independent of the other"); *Wheeler v. Yettie Kersting Memorial Hosp.*, 866 S.W.2d 32, 44 n.16 (Tex. Civ. App. 1993) (pointing out that *Burgess v. Superior Court*, 2 Cal. 4th 1064, 9 Cal. Rptr. 2d 615, 831 P.2d 1197 [1992], noted the scope of duty owed by a treating physician to a pregnant woman extends to the fetus and includes a duty to avoid injury to the fetus). These decisions support our holding that a duty to the fetus exists in the abstract.

The difficulty arises when we leave the abstract for the real world. Does a referring family practice physician such as Dr. Donnell have a doctor-patient relationship with Bonnie—and thus Audra—sufficient for a duty to arise? Do the duties Drs. Brown and Moser admit they have to Audra extend beyond the termination of their relationship to Bonnie? Does their knowledge of Bonnie's communicable disease and ways to minimize the risk of its transmission to Audra affect the answer? What are the parameters of the duty in such a situation?

Where a communicable disease has been diagnosed in a pregnant woman who desires to continue her pregnancy to term and deliver a healthy baby, we agree with the district court that the woman's physician an obligation as a matter of law to inform the woman of the diagnosis. See Annot., Malpractice: Failure of Physician to Notify Patient of Unfavorable Diagnosis or Test, 49 A.L.R. 3d 501 pp. 507-512, and 2001 Supp. p. 43; see also *Jacobs v. Theimer*, 519 S.W.2d 846, 848 (Tex. 1975) (finding that a physician was under the duty to disclose to a pregnant woman that she had contracted rubella and to inform her of the risk of proposed

treatment in continuing the pregnancy); *Ray v. Wagner*, 286 Minn. 354, 355-57, 176 N.W.2d 101 (1970) (a routine Pap smear reported "suspicious for malignancy"; doctor tried to reach patient to report result but she had moved without notifying the doctor of a forwarding address, and she had no phone at her home; carcinoma of the cervix diagnosed; doctor had a duty to take whatever steps were reasonable to notify the patient of her test results; negligence and causation were jury questions; jury's verdict was for the doctor).

Because a woman's interest in preventing the spread of a disease is intertwined with any interest or potential interest of her fetus at that point, this holding is consistent with the physician's tandem duty to the fetus. It is also philosophically consistent with decisions from other jurisdictions recognizing a doctor's duty to inform non-patient third parties of infectious disease to prevent its spread. See *Hoffman v. Blackmon*, 241 So. 2d 752, 753 (Fla. Dist. App. 1970), *cert. denied* 245 So. 2d 257 (Fla. 1971) (finding the physician was liable for failing to warn family members that a patient with a communicable disease could infect them); *Moreta v. New York City Health & Hospitals Corp.*, 238 App. Div. 2d 149, 149, 655 N.Y.S.2d 517 (1997) (finding that physicians owed a duty to the unborn child, where medication was discontinued during pregnancy and resulted in the child's contracting tuberculosis from the mother); *DiMarco v. Lynch Homes-Chester County*, 525 Pa. 558, 561-63, 583 A.2d 422 (1990) (finding that under Restatement [Second] of Torts § 324A [1965], physicians owed a duty to the boyfriend of a hepatitis B carrier); *Troxel v. A.I. Dupont Institute*, 450 Pa. Super. 71, 83-84, 675 A.2d 314, *rev. denied* 546 Pa. 668 (1996) (finding that physicians have a duty to third persons and must correctly inform the patient about the contagious nature of the disease to prevent its spread to those who are within the foreseeable orbit of risk of harm); *Bradshaw v. Daniel*, 854 S.W.2d 865, 872-73 (Tenn. 1993) (finding the physician had a duty to warn identifiable third persons in the patient's immediate family of foreseeable risks associated with Rocky Mountain Spotted Fever).

We also note that this court in *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093 *reh. denied*, 187 Kan. 186, 354 P.2d 670 (1960), expressed an interesting tangential observation on informing a pa-

tient. *Natanson* concerned an allegation of medical malpractice where the patient consented to treatment but claimed the nature and risks of cobalt treatment for cancer had not been explained to her. The *Natanson* court said:

"There is probably a privilege, on therapeutic grounds, to withhold the specific diagnosis where the disclosure of cancer or some other dread disease would seriously jeopardize the recovery of an unstable, temperamental or severely depressed patient. *But in the ordinary case there would appear to be no such warrant for suppressing facts and the physician should make a substantial disclosure to the patient prior to the treatment or risk liability in tort.*" (Emphasis added.) 186 Kan. at 406.

The other specific questions posed by this case are questions of fact that require further development of the record on retrial. Whether all or some of the physicians treating Bonnie failed to use the required care and diligence in discharging their duty to inform her of her hepatitis B status is to be decided with the aid of expert medical testimony. The jury should be guided by the language in PIK Civ. 3d 123.01, Duty of Health Care Provider:

"In performing professional services for a patient, a [physician] has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession and of that school of medicine in the community in which the [physician] practices, or in similar communities, and under like circumstances. In the application of this skill and learning the [physician] should also use ordinary care and diligence. A violation of this duty is negligence."

See also PIK Civ. 3d 123.10 (expert testimony).

The physician defendants will be free to argue that, once a pregnant patient is transferred to another doctor, the transferring doctor is governed by a different standard of care. Audra will be free to contend that a continuing duty existed to provide treatment and care to her while in utero and at the time of her birth. The jury will be free to decide whether the physicians were required to act to inform Bonnie throughout the period during which preventive steps could have been taken and whether a patient's primary care physician continues to be responsible for the well-being of the expectant patient and the patient's fetus, even when the patient is referred to an obstetrical specialist. PIK Civ. 3d 123.12 relates to the duty of a medical specialist and PIK Civ. 3d 123.13 covers the

referral of a patient to another health care provider. ("A ___ who undertakes the treatment and care of a patient and refers the patient to a ___ for treatment and care is not legally responsible for any negligence on the part of the ___ unless (he)(she) has failed to exercise reasonable care in selecting the ___.") See *Stovall v. Harms*, 214 Kan. 835, 522 P.2d 353 (1974); *accord* 2 Louisell & Williams, Medical Malpractice ¶ 16.05(1) (2001) (liability for referrals).

. For example, Dr. Donnell proffered the testimony of Dr. David Kingfisher. Dr. Kingfisher, because of the district court's summary judgment ruling leading to Instruction No. 15, was not permitted to testify. Dr. Donnell's counsel said:

"In arguments in response to summary judgment motion of the plaintiff with respect to duty at that time I presented to the court the opinion of Dr. David Kingfisher and I would as a matter of judicial economy as well as overall economy proffer that. If he was called to testify he would testify as to the duty of Dr. Donnell and that Dr. Donnell's duty was met by properly transferring obstetrical care of Bonnie Nold to Dr. Moser and that the patient who is bringing this action, Audra Nold, under these circumstances was not the patient of Dr. Donnell and he was not in a position to protect her from the alleged injury."

Expert witnesses should be permitted to testify on retrial for both sides to assist the jury in determining the contours of the doctor-patient relationship and resulting duty in a referral system.

Dr. Moser's contention that he had no physician-patient relationship with Audra following her delivery, and Dr. Brown's evidence that he ended his doctor-patient relationship with Bonnie during the first trimester of her pregnancy, should also be considered by the trier of fact. The effect of the termination of Dr. Binyon's care by Bonnie also should be considered. Whether a doctor-patient relationship exists is generally a question of fact for the jury. *Rule v. Cheeseman, Executrix*, 181 Kan. 957, 964, 317 P.2d 472 (1957). A duty arises and liability may be imposed only for negligence occurring during the doctor-patient relationship. Again, expert medical testimony will assist the jury in resolving Audra's negligence claims under the standard of care owing to Bonnie and Audra during the existence of each of Bonnie's particular doctor-patient relationships.

## Duty to Report to Public Agencies

Instruction No. 15 also addressed the district court's holding that Bonnie's physicians had a duty to report Bonnie's hepatitis B status to the local health department.

The version of K.S.A. 65-118 in effect in 1990 said:

"Whenever any person licensed to practice the healing arts . . . knows or has information indicating that a person is suffering from or has died from an infectious or contagious disease, such knowledge or information shall be reported immediately to the county . . . board of health . . . , together with the name and address of the person who has or is suspected of having the infectious or contagious disease . . . ."

The Kansas Department of Health and Environment (KDHE) has adopted rules relating to the reporting of infectious or contagious diseases. See K.A.R. 28-1-2. K.S.A. 65-101(a)(6) authorizes the Secretary of Health and Environment to adopt rules and regulations to carry out the Secretary's 65-101(a) responsibilities, including reporting requirements. K.S.A. 65-101(a)(1). K.A.R. 28-1-1(h) defines "disease" as a "definite morbid process having a characteristic train of symptoms." K.A.R. 28-1-2 lists infectious or contagious diseases and was amended in 1990. K.A.R. 28-1-2(a) (1989) listed hepatitis, type A (infectious), K.A.R. 28-1-2(a)(20); type B (serum), K.A.R. 28-1-2(a)(21); and type non-A non-B, K.A.R. 28-1-2(a)(22).

Dr. Donnell cites K.S.A. 1990 Supp. 65-6004 to support his argument that defendants had no duty to warn others of Bonnie's hepatitis B status. In 1990, 60-6004 pertained only to the reporting of AIDS test results and does not apply here. (K.S.A. 65-6004 was amended in 1996 to include "an infectious disease." See K.S.A. 2000 Supp. 65-6004[a]).

Dr. Gianfranco Pezzino, the State Epidemiologist with KDHE, a witness for defendants, testified that in 1990 chronic hepatitis was not reportable in Kansas and is not reportable today. He was familiar with the administrative regulations as head of the epidemiology division of the agency charged with adopting the regulations. Viral hepatitis on the list of reportable diseases but not chronic hepatitis. The district court's Instruction No. 17 requested by Audra referenced K.A.R. 28-1-2(16), viral hepatitis. According

to Dr. Pezzino, the case definition for viral hepatitis "is an acute illness with discrete onset of symptoms of jaundice or elevated serum enzymes." He was reading from a "standardized case put together by the Centers for Disease Control and Department of Epidemiology."

Carol Borger, R.N., administrator of the Butler County Health Department, was a witness for plaintiffs. On cross-examination she was asked by counsel for Dr. Brown:

"Q.   Those forms and formats as you got in 1990 specifically pointed out you do not report cases of chronic hepatitisor chronic carriers, isn't that a fact?
"A.   I believe that's what the form says."

We also note in the record a letter of May 27, 1992, from Keck R. Hartman, M.D., to Larry R. Hund, M.D., reporting that Bonnie is a "hepatitis B carrier with a positive surface antigen. I checked her enzymes and they are normal which indicates she does not have chronic active disease." On cross-examination Bonnie agreed that she had been told that she was symptom free at this point in time.

Dr. Larry W. Rumans, who has an active practice in infectious diseases, a witness for Audra, testified the reporting standards were generated by KDHE, "often at the request of the Centers for Disease Control." According to him, the reporting requirement is the same regardless of whether hepatitis chronic or acute. He opined that the health department should have been notified "that Mrs. Nold had chronic hepatitis B."

The existence or nonexistence of a reporting duty under K.S.A. 65-118 remains an issue on remand. Questions that may arise include: What type of hepatitis did Bonnie have in 1990? What reporting did the applicable KDHE regulation require? Is there a medical distinction between "viral" hepatitis and "chronic" hepatitis? What significance does the K.A.R. 28-1-1(h) definition of "disease" have? If Bonnie's hepatitis B in 1990 was "symptom free" did she have a "disease" under 28-1-1(h)? It would seem that if there is a medical distinction between "viral" and "chronic," and if Bonnie's hepatitis B in 1990 was not "viral," none of the defendant physicians could have had a K.S.A. 65-118 or K.A.R. 28-1-2(16)

reporting duty. If her hepatitis B in 1990 was "viral," it appears at least some of the defendants would have had a reporting duty. We do not prejudge this question. Resolution will rest with the district court, assisted by expert medical testimony and experienced medical malpractice counsel.

### Conclusion

We hold, as a matter of law, that a physician who has a doctor-patient relationship with a pregnant woman who intends to carry her fetus to term and deliver a healthy baby also has a doctor-patient relationship with the fetus. We also hold as a matter of law that the pregnant woman is entitled to be informed if test results reveal that she has a communicable disease that can be transmitted to her baby during labor and delivery.

On remand, the district court will specify in the instructions the specific allegations of negligence supported by the evidence. See *Natanson v. Kline*, 186 Kan. at 399. Dr. Bundren shall be permitted to testify, and Wesley shall be included again as a defendant in the lawsuit. Expert standard of care medical testimony may be introduced on Audra's claims concerning the defendant physicians' failure to report to Bonnie her hepatitis B test result, the adequacy of the reporting of her test result to other physicians and the hospital, the failure of Audra to receive the postdelivery gamma globulin injection and hepatitis B vaccination, and Wesley's duties under the existing circumstances.

We cannot foresee what may occur at retrial. Defendants not involved in this appeal as well as Wesley may be in the courtroom. The district court will control the case as it develops after remand consistent with this decision in ruling on motions, evidence, and instructions.

Reversed and remanded for a new trial.

McFARLAND, C.J., not participating.

CAROL A. BEIER, J., assigned.