**F I L E D**

**UNITED STATES COURT OF APPEALS**

**February 7, 2006**

**FOR THE TENTH CIRCUIT**

YOLANDA ESPOSITO,

    Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

    Defendant-Appellee.

No. 05-3099
(D.C. No. 02-CV-2078-KHV)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **McCONNELL, ANDERSON**, and **BALDOCK**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Yolanda Esposito appeals from the district court's order granting summary judgment on her complaint for wrongful death brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671-2680 (FTCA). We affirm.

This is the second time this case has come before us. In a prior opinion, we instructed the district court to substitute Mrs. Esposito as plaintiff for the decedent, Raymond Elio Esposito, since her attorney had made an "honest mistake" in naming Mr. Esposito as plaintiff. *Esposito v. United States*, 368 F.3d 1271, 1275-78 (10th Cir. 2004) (citing official commentary to Fed. R. Civ. P. 17(a)). We permitted the substitution, notwithstanding the argument of the United States that it had been prejudiced by the mistake, but noted:

> The typical grounds for prejudice are absent, since the United States had actual notice of Mrs. Esposito's claim against it once she filed an administrative tort claim. The United States relies instead on the delay caused by Mrs. Esposito's failure to move for substitution earlier in the action and it points, *inter alia*, to plaintiff's failure to provide discovery *and to designate an expert witness on medical care issues*. . . . Nothing in our decision should be viewed as prohibiting the United States from raising these issues or as prohibiting the district court from taking appropriate action in response to them. *Nor do we hold that substitution should relieve plaintiff of any deadlines previously established in this case.* These are matters to be considered on remand by the district court.

*Id.* at 1278 (emphasis added).

On remand, the United States moved for summary judgment, arguing that without a medical expert, Mrs. Esposito could not prove that her husband's death while in custody of the Bureau of Prisons had been the result of negligent medical

-2-

care. In its order granting summary judgment, the district court noted that Mrs. Esposito had not disclosed any expert medical reports, designated any expert witnesses, or disclosed any expert witness reports. The deadlines for doing so were long past, and Mrs. Esposito had not sought additional time to obtain expert medical testimony. Rather, she asserted that the United States' negligence could be proved without a medical expert, either by using the "common knowledge exception" to the general rule requiring expert testimony, or by application of the doctrine of *res ipsa loquitur*. The district court rejected each of these doctrines and ruled that "[b]ecause plaintiff has produced no evidence that defendant deviated from the standard of care, or that any such deviation caused injury to Mr. Esposito, defendant is entitled to summary judgment." Aplt. App. at 169.

## FACTS

Mr. Esposito, the decedent, was incarcerated at the United States Penitentiary in Leavenworth, Kansas ("USP"), after his conviction on a 1994 indictment. He arrived at USP in December 1996. He was seen frequently at the USP cardiac care clinic during 1997 and 1998 for cardiac care, liver problems, and prescription and adjustment of medications. On October 31, 1998, Dr. Philip K. Hill completed a form 204 "Medical/Surgical and Psychiatric Referral

Request," referring Mr. Esposito for a "Routine-Urgent" transfer to the Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP"). *Id.* at 110-15.[1]

Dr. Hill stated on the form that the reason for the transfer was that Mr. Esposito had experienced an "Adverse Reaction to Medication Regime Started on August 5, 1998 with continued failure to regulate and decompensation." *Id.* at 111. Mr. Esposito had been treated for a H. pylori infection, and had developed problems with his cardiac medication as a result. *Id.* at 43-44. Dr. Hill further explained that treatment could not be provided locally because "[w]e have reached a plateau with limited rehabilitation return. It is felt medically that this inmate should have more intense monitoring, diagnosis and therapeutic control." *Id.* at 113. The request for transfer was approved on November 5, 1998. *Id.* at 116. Mr. Esposito was not physically transferred to MCFP, however, until approximately eleven weeks later, on January 25, 1999.

In the meantime, Mr. Esposito reported to USP's health services unit on November 20, 1998, complaining of shortness of breath. He was transported to Saint John Hospital, an outside facility, where he remained for two days. His discharge diagnoses included cirrhosis of the liver with portal hypertension,

---

[1] The form specifies three types of referral. "Routine" referral means the inmate "[m]ay travel by any means, time not critical." Aplt. App. at 110. "Routine-Urgent," the referral made in this case, means that "[t]ravel should be within two weeks and/or condition warrants direct transfer, not by BOP." *Id.* "Emergency" means that the "[t]ime and mode of travel [are] critical." *Id.*

coagulopathy, hemachromatosis, dilated cardiomyopathy with chronic congestive heart failure, Hepatitis B, mitral valve replacement, and history of rheumatic fever. *Id.* at 153. On November 23, 1999, an addendum was added to the form 204, noting that it had been necessary to hospitalize Mr. Esposito "for increasing dyspnea, cardiac arrythemias in the form of multiple PVC's and ST segmental changes and chest pain with a pericardial friction rub." *Id.* at 110. This addendum opined that "this inmate is not suitable for housing at this facility and is in need [of] a much more in-depth medical work up in a multi[-]disciplinary team concept approach." *Id.*

Mr. Esposito received continued treatment at USP between November 20, 1998 and January 25, 1999. Abnormal lab test results obtained on January 17, 1999, resulted in an effort to transport him immediately to MCFP; however, no beds were available. Instead, staff again transported Mr. Esposito to Saint John Hospital, where he remained until January 19. Hospital records from Saint John indicated that Mr. Esposito was suffering from "incipient hepatorenal syndrome from cardiac cirrhosis," that he "knows this condition is terminal" and that he had requested not to be resuscitated. *Id.* at 117. His condition on discharge from Saint John was described as "extremely fragile" and efforts were made to expedite his immediate transfer to MCFP. *Id.* at 51-52.

Upon his arrival at MCFP on January 25, 1999, according to the death summary later prepared by medical personnel, "Mr. Esposito's condition was determined to be terminal with a life expectancy estimated at less than six months." *Id.* at 120. "He was provided a hospice companion who in concert with professional medical personnel provided emotional support during the dying process. Medical care was directed toward supportive care in making Mr. Esposito as comfortable as possible." *Id.* Mr. Esposito died at MCFP on March 12, 1999. The final diagnoses were cardiac failure and hepatic and renal failure secondary to the cardiac failure.

The only medical opinion in the record concerning the standard of care or deviation therefrom is that of William B. McCollum, M.D., Ph.D., a medical officer at USP. After analyzing Mr. Esposito's medical records in some detail, he opined:

> The plaintiff received appropriate and more than adequate medical care while housed at USP Leavenworth. There is, in my opinion, no indication from the medical record that staff acted inappropriately or in a negligent manner when treating the plaintiff.

*Id.* at 53.

In a supplemental declaration, Dr. McCollum stated that "[i]t is clear from a review of Mr. Esposito's medical records that he was terminally ill long before a referral was made by medical staff at USP Leavenworth." *Id.* at 145. Dr. McCollum further opined that "[t]ransferring Raymond Esposito to MRC,

Springfield in October 1998 would not have increased Mr. Esposito's life-expectancy or chances of recovery from his terminal medical condition." *Id.*

## ANALYSIS

> We review a district court's grant or denial of summary judgment de novo. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the evidence presents a genuine issue of material fact, we view it in the light most favorable to the party against whom summary judgment was entered.

*Stanko v. Maher*, 419 F.3d 1107, 1111-12 (10th Cir. 2005) (quotation omitted).

Although Mrs. Esposito's complaint identifies a number of different negligent acts allegedly committed by agents and employees of the United States, she concentrates her appellate briefing on a single theory: that the United States was negligent in failing to promptly transfer Mr. Esposito to MCFP to receive treatment necessary to his survival. Mrs. Esposito asserts that the district court ignored this theory in its order granting summary judgment. A careful reading of the district court's order, however, demonstrates that the district court both considered this theory of negligence and analyzed it correctly.

"State substantive law applies to suits brought against the United States under the FTCA." *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004). Under Kansas law, "[t]he standard of medical or hospital care which is to be applied in any given case is not a rule of law, but a matter to be

established by the testimony of competent medical experts." *Nold ex rel. Nold v. Binyon*, 31 P.3d 274, 285 (Kan. 2001).

Strictly speaking, this case, which involves a preexisting condition likely to result in death even without allegedly negligent treatment, is one for "loss of chance of survival." *See Delaney v. Cade*, 873 P.2d 175, 178 (Kan. 1994). Such cases arise where "the patient fails to survive and the loss suffered is the lost chance of surviving [a] preexisting injury or illness or at least a lost chance of a substantial increase in the length of such survival." *Id.* While "loss of chance of survival" cases involve a reduced standard of causation when compared to traditional medical malpractice actions, *id.* at 183, a plaintiff alleging loss of chance of survival still must prove the traditional elements of a medical malpractice action, *id.* at 185.[2]

Under Kansas law, in order for Mrs. Esposito to establish medical malpractice, she must show that the United States "owed [Mr. Esposito] a duty of care and [was] required to meet or exceed a certain standard of care to protect [him] from injury; . . . breached this duty or deviated from the applicable standard

---

[2] The plaintiff in *Delaney* asserted as part of her claim that her physician had been negligent in delaying her transfer to a facility that was equipped to treat her injuries. 873 P.2d at 177. Other cases make it clear that failure to promptly refer or transfer a patient for appropriate medical treatment can constitute a form of medical malpractice. *See, e.g., Deasy v. United States*, 99 F.3d 354, 358-59 (10th Cir. 1996) (applying Colorado and Maryland law in FTCA case).

of care; and [he] was injured and [his] injury proximately resulted from [this] breach of the standard of care." *Nold*, 31 P.3d at 285. "Expert medical testimony is ordinarily required" to make this showing. *Id.*

Mrs. Esposito relies, however, on an exception to the general rule requiring expert testimony to establish the elements of a medical malpractice action. The so-called "common knowledge exception" applies "if what is alleged to have occurred in the diagnosis, treatment, and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally." *Hare v. Wendler*, 949 P.2d 1141, 1147 (Kan. 1997) (quotation omitted). This case does not fall within that exception. Medical malpractice cases involving a loss of chance of survival, like this one, usually entail difficult probabilistic calculations involving the severity of the illness and the efficacy of medical treatment. *See generally Delaney*, 873 P.2d at 180-82 (analyzing cases). It would not be at all within the "common knowledge and experience of mankind" to determine, without expert assistance, whether Mr. Esposito could have survived his very serious medical conditions had he been transferred earlier to MCFP and received treatment there. Moreover, the United States has submitted medical testimony, uncontroverted by Mrs. Esposito, that an

earlier transfer would not have increased Mr. Esposito's life-expectancy or chances of recovery. Aplt. App. at 145.

The same considerations defeat Mrs. Esposito's reliance on the doctrine of *res ipsa loquitur*. The Kansas courts require a plaintiff seeking to invoke this doctrine to establish three elements: "First, the thing or instrumentality causing the injury or damage must be within the exclusive control of the defendant. Second, the injury must be of the kind that ordinarily would not occur in the absence of someone's negligence. Third, the injury must not be due to the contributory negligence of plaintiff." *Savina v. Sterling Drug, Inc.*, 795 P.2d 915, 933 (Kan. 1990). It is the second element that fails here. "In medical malpractice cases, the doctrine only applies when a layman could find, as a matter of common knowledge, that the patient's condition was such that would ordinarily not have occurred if due care had been exercised." *Butler ex rel. Commerce Bank, N.A. v. HCA Health Servs. of Kan, Inc.*, 6 P.3d 871, 887 (Kan. Ct. App. 1999). As we have already stated, however, the "common knowledge" exception does not apply to the facts of this case. Expert testimony is required to prove Mrs. Esposito's case, and none is available. For this reason, *res ipsa loquitur* is unavailable as well. *See id.* (holding *res ipsa loquitur* inapplicable in case where "both liability and causation had to be established by expert witnesses").

In her appellate briefing, Mrs. Esposito also cites the deliberate indifference standard applicable to Eighth Amendment claims brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Since she did not raise a *Bivens* claim in the district court, however, we need not consider whether the assertion of an Eighth Amendment claim would relieve her of the necessity of designating an expert witness to address negligence and/or causation issues.

Kansas law required medical expert testimony in this case to establish the elements of Mrs. Esposito's negligence claim. She presented none in response to the United States' motion for summary judgment. The district court therefore properly granted summary judgment in favor of the United States.

The judgment of the district court is AFFIRMED.

Entered for the Court

Stephen H. Anderson
Circuit Judge