FILED
United States Court of Appeals
Tenth Circuit

May 21, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TERRI GREIG, as Special
Administrator of the Succession of
Michael E. Greig, Deceased, and Terri
Greig, Individually as Representative
Heir at Law of Michael E. Greig,
Deceased,

      Plaintiff-Appellant,

v.

MAGED S. BOTROS, M.D.,

      Defendant-Appellee.

No. 12-3066
(D.C. No. 6:08-CV-01181-EFM)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **KELLY** and **LUCERO**, Circuit Judges.

---

Terri Greig brought this medical malpractice action against Dr. Maged

Botros in the District of Kansas based on diversity jurisdiction pursuant to 28

U.S.C. § 1332(a). The decedent Michael Greig, Terri Greig's husband, died from

a ruptured aortic dissecting aneurysm, which occurs when the aorta tears. We

exercise our jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

## I. BACKGROUND

On June 19, 2006, at approximately 5:00 p.m., the decedent Michael Greig, who was then 36 years old, arrived at the emergency room of Via Christi Regional Medical Center–St. Francis campus ("St. Francis") in Wichita, Kansas, with complaints of chest pains. Michael Greig, a resident of Louisiana, was a pilot who had traveled to Wichita on business for aircraft maintenance. While lifting weights at a YMCA, Michael Greig experienced chest pains and was taken to St. Francis. At St. Francis, Dr. Maged Botros, an emergency room physician, examined Michael Greig. Michael Greig presented symptoms that included shortness of breath, diaphoresis (sweating), chest pain, and tightness in the middle of his chest radiating into his jaw. Michael Greig told Dr. Botros that he was lifting weights when the pain started and that he had consumed alcohol the night before. Dr. Botros testified that Michael Greig's symptoms were consistent with acute coronary syndrome and many non-cardiac conditions.

Dr. Botros examined Michael Greig's vitals, which were in the normal range. Dr. Botros also ordered various tests for Michael Greig, including electrocardiograms ("EKGs"), cardiac enzyme tests, and a chest x-ray. EKGs were completed on Michael Greig at approximately 5:10 p.m. and 6:00 p.m. Dr. Botros interpreted the first EKG as displaying abnormal P waves, but he did not observe a change from the first EKG to the second EKG. Three serial cardiac enzyme tests were ordered at 5:16 p.m., 7:13 p.m., and 1:05 a.m. The first

2

enzyme test came back with a result of 0.01, which Dr. Botros noted was low and would be expected with someone with acute coronary syndrome. The second enzyme test came back with a result of 0.05, which was still within the normal range, but Dr. Botros explained that the increase was "concerning." Aplt. App. Vol. III at 790. Michael Greig's chest x-ray came back normal. Dr. Botros testified that he would have expected to see an abnormal chest x-ray with a diagnosis for aortic dissection.

Dr. Botros did not order a cardiac consult, and he did not order a CT scan with contrast because he did not think that they were required at the time. A medical expert for Terri Greig testified that not ordering a CT scan with contrast, which looks for aortic dissection, was a violation of the standard of care. Dr. Botros and his medical experts testified that not ordering a CT scan with contrast was within the standard of care.

Dr. Botros suspected that Michael Greig was suffering from angina, which is related to coronary artery disease. Dr. Botros ordered that Michael Greig be admitted for observation overnight at the Clinical Decision Unit ("CDU") and that he have a stress thallium cardiac treadmill test at the hospital the following morning. Dr. Botros went off duty at midnight and had no further contact with Michael Greig.

At approximately 7:30 a.m. on June 20, 2006, Michael Greig was found slumped over and unresponsive in a chair in his hospital room. He was in the

3

process of putting on his shoes for the cardiac stress test. The cause of death was determined to be a ruptured dissecting aortic aneurysm.

The case proceeded to trial, and the jury returned a verdict in favor of Dr. Botros. On November 2, 2011, Terri Greig filed a motion for a new trial. On March 5, 2012, the district court denied her motion for a new trial. Terri Greig appeals from the district court's denial of her motion for a new trial.

## II. DISCUSSION

Terri Greig argues that the district court erred in denying her motion for a new trial. She argues that the district court erred in the following respects: issuing Instruction No. 14 to the jury; issuing a misleading supplemental instruction to the jury in response to a jury question; excluding key testimony on the basis of hearsay; prohibiting cross-examination of defense experts; striking some of the testimony of Terri Greig's expert economist; and issuing a "best judgment" instruction.

### A. Standard of Review

We review the district court's denial of a new trial for abuse of discretion. Meyer v. Christie, 634 F.3d 1152, 1160 (10th Cir. 2011). "A district court abuses its discretion when it bases its ruling on an erroneous view of the law," and "[a] new trial cannot be granted unless the error was prejudicial and affects the party's substantial rights." Henning v. Union Pac. R.R. Co., 530 F.3d 1206, 1217 (10th Cir. 2008).

4

As regards issues involving alleged instructional errors, "[a] 'district court's decision to give a particular jury instruction [is reviewed] for abuse of discretion; ultimately, however, we apply a de novo standard of review to determine the propriety of an individual jury instruction to which objection was made at time of trial.'" Reed v. Landstar Ligon, Inc., 314 F.3d 447, 454 (10th Cir. 2002) (second alteration in original) (quoting Osteguin v. S. Pac. Transp. Co., 144 F.3d 1293, 1295 (10th Cir. 1998)). "'The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.'" Townsend v. Lumbermens Mut. Cas. Co., 294 F.3d 1232, 1237 (10th Cir. 2002) (quoting Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999)).

We review a "'district court's evidentiary decisions for abuse of discretion.'" Fischer v. Forestwood Co., 525 F.3d 972, 984 (10th Cir. 2008) (quoting Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1081 (10th Cir. 2006)). "'In reviewing [such a decision], [this court] will not disturb the determination absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment.'" Id. (first alteration in original) (quoting Harsco Corp. v. Renner, 475 F.3d 1179, 1190 (10th Cir. 2007)).

**B. Jury Instruction No. 14 and Supplemental Instructions**

Jury Instruction No. 14 states the following:

Proof by a preponderance of the evidence of causation is necessary to a finding of fault. A defendant is "at fault" when he is negligent and that negligence causes or contributes to cause the event which brought about the injury for which the claim is made. A person may be negligent but unless that negligence causes or contributes to cause the injury, that person cannot be "at fault".

Aplt. App. Vol. II at 359.

Terri Greig argues that Jury Instruction No. 14 was not based on Kansas pattern jury instructions ("PIK"). She also argues that the district court erred because Jury Instruction No. 14 was based on the PIK instructions for comparative fault when comparative fault was not at issue in the case.

The Kansas Supreme Court has held that "it is not mandatory for Kansas courts to use [pattern jury] instructions, although it is strongly advised." State v. Appleby, 221 P.3d 525, 553 (Kan. 2009). As the Kansas Supreme Court explained,

> "The pattern jury instructions for Kansas (PIK) have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed."

Id. (quoting State v. Johnson, 874 P.2d 623, 630 (Kan. 1994)).

6

Terri Greig did not propose an alternate jury instruction for causation. Nor was the jury instruction an inaccurate statement of the law. Terri Greig argues that the phrase "caused or contributed to the event which brought about the injury for which the claim was made" in the jury instruction given was inappropriate under the facts of the case. Aplt. Br. at 19. As the district court noted in its order denying Terri Greig a new trial, "causation is a vital element of a medical malpractice action, which requires negligence (breach of a duty) and causation of a resulting injury." Aplt. App. Vol. II at 494.

In Kansas, three elements are required to establish a medical malpractice case:

> (1) The physician owes the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the physician breached this duty or deviated from the applicable standard of care; and (3) the patient was injured and the injury proximately resulted from the physician's breach of the standard of care.

Esquivel v. Watters, 183 P.3d 847, 850 (Kan. 2008) (citing Nold v. Binyon, 31 P.3d 274, 285 (Kan. 2001)). "The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the plaintiff's injury." Id. (emphasis added) (alteration and quotation omitted). The district court here did not err in instructing the jury regarding causation.

Terri Greig further argues that the district court erred in answering the

7

jury's question. The jury submitted the following question to the district court:

> We are in need of clarification on Instruction #14. Does the wording indicate that the defendant would be "at fault" if his actions caused the death of Mr. Greig? Is there a distinction that must be made between "cause" or "contributes to cause" death as opposed to actions "did not save", meaning must we stick to the exact wording of the instruction? ie Letter of the law vs. Spirit of the Law.

Aplt. App. Vol. II at 369. The district court submitted the following answer to the jury's question:

> I cannot provide you any more clarification on Instruction #14 than is provided there. You should follow all of the Instructions as written. You must follow my instructions on the law despite any opinion you may have about what the law should be.

Id. Terri Greig cites the jury's question as an indication that the jury "was quite clearly confused" regarding Instruction No. 14. Aplt. Br. at 20. In addition, Terri Greig argues that the district court's response to the jury dissuaded the jury from a finding in favor of Terri Greig because "the court was determined to push the jury as far toward a literal, technical interpretation as possible – even when it was patently obvious that the literal, technical interpretation was not a correct interpretation of the governing law." Id.

The district court did not misstate governing law in its response to the jury question. After the district court received the question from the jury, both Terri Greig and Dr. Botros agreed that the district court should refer the jury to the

8

entirety of the jury instructions.  However, Terri Greig disputed the use of "as written" in the district court's response:

> I just don't like "as written" just because [the jury is] obviously having some debate, so "you should follow all the that [sic] instructions" would be a better thing to say because they can have an [sic] semantic debate, pursuant to the earlier instructions about the terminology.

Aplt. App. Vol. VI at 1821.  Terri Greig was concerned that if the district court instructed the jury to follow directions as written, the jury may be "too technical" in their deliberation:

> My concern -- I guess I do have a concern just when we say you have to follow them as written, that someone clearly could have -- they could come back with a defense verdict because we haven't answered the question.
> . . . .
> I'm a little paranoid just because they're obviously having a discussion about -- and there's some folks in there saying if they had given -- . . . -- if there would have been a surgery, he missed a chance to save his life, but they're saying yeah, it didn't cause his death, so now they're having this debate between, well, you can't read into the instruction, should have saved his life, and so if we go back and say you have to read just as it's written, the folks arguing for did not save may be --
> . . . .
> [M]y request, would be to not be as detailed in the response and just say please read -- "all the Court can do in terms of guidance is to tell you to read the entirety of the instructions."  "As written," to me, gives them opportunity -- it would put -- and I understand, Your Honor, but it seems like if you say you have to do it as written, then they might be too technical, when it's clear that the other instructions say you have to read them as a whole, you can use your experience, you can -- they

9

certainly can make the proper inference that causation, cause, can mean did not save, but if we say "as written," I think it creates too detailed a position with regard to that one instruction and could create a problem.

Id. at 1819-21.

However, Jury Instruction No. 1 instructed the jury to follow the instructions as given by the court, instead of following the "spirit of the law":

You are duty bound to follow the law as I explain it to you in the instructions that I am about to give you. . . . Also, do not concern yourselves with the wisdom of the law. Despite any opinion you may have about what the law should be, you would violate your sworn duty if you were to base your verdict upon any view of the law other than that given to you in these instructions.

Aplt. App. Vol. II at 346. The district court's response to the jury's question is functionally equivalent to Jury Instruction No. 1 and only instructs the jury to follow the law. The district court did not err in responding to the jury's question.

## C. Hearsay

Terri Greig argues that the district court erred in excluding portions of her testimony as inadmissible hearsay. In deposition, Terri Greig had discussed a telephone conversation that she had with Curt McDonald, Michael Greig's coworker, who was also in Wichita, the night that Michael Greig was admitted to the hospital. Terri Greig discussed how McDonald told her that Dr. Botros had offered Michael Greig the opportunity to return to his hotel:

Later on that evening I was told that he could have -- he had the option of going back to the hotel and coming

10

back the next morning for the stress test or being observed overnight and Michael chose -- because of how bad he was feeling, he chose to stay in the hospital.

Aplt. App. Vol. I at 201.

Prior to trial, Dr. Botros had filed a motion in limine to preclude Terri Greig from testifying on whether Michael Greig had been given the option of going back to his hotel on the night that he was hospitalized. Id. at 100-01 ("The above statements are inadmissible hearsay under Fed. R. Evid. 801 and 802, and should, therefore, be excluded as evidence at trial."). The district court reserved ruling on the issue until trial. Dr. Botros renewed the motion in limine during trial, and the district court granted his motion. Terri Greig's testimony on her conversation with McDonald was later proffered before the district court:

> Q. Terri, just a -- during the time in the hospital, when Mike was in the hospital, did you come to some understanding that he had earlier been offered the opportunity to return to his hotel and come back for a later test?
> A. Yes.
> Q. All right. And do you recall how you learned that and the circumstances of that?
> A. I believe it was from -- I believe it was from Curt [McDonald]. And he told me that Michael had the option of going home or being observed overnight, come back. If he went back to the hotel, to come back and do a stress test in the morning. But Michael, how bad he was feeling, that he was going to stay overnight. And I remember saying, well, good, 'cause if he's not having a heart attack and he's in so much pain, why would he go?
> And so it was my understanding that he was given

11

the option to go back to the hotel or stay and be observed, and he chose to be observed.

Aplt. App. Vol. IV at 1265-66.

Hearsay evidence "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), and it is generally inadmissible. Fed. R. Evid. 802.[1] In its order denying Terri Greig's motion for a new trial, the district court held that "[t]he recounting of this alleged conversation by Mr. McDonald to Plaintiff is double hearsay," and that "[i]f Mr. McDonald was not even present for the conversations, as Defendant suggests, the statements relayed by Mr. Greig to Mr. McDonald and then by Mr. McDonald to Plaintiff constitute triple hearsay." Aplt. App. Vol. II at 501.

Terri Greig contends that Dr. Botros waived his arguments regarding the admissibility of Terri Greig's testimony when he failed to object to her line of questioning on the issue while he was testifying. During trial, Dr. Botros was asked whether Michael Greig was given the opportunity to return to his hotel the night that he was admitted to the hospital:

> Q.    All right. Now, I want to ask you a little bit about this notation about stable for discharge to go home.
> You recall during your deposition I asked you to

---

[1]    The Federal Rules of Evidence were amended in December 1, 2011, as part of a general restyling of the Rules. We apply the version of the Rules that were applicable at the time of trial.

12

assume that it was -- assume that it was Mrs. Greig's understanding that you had offered Michael Greig the option of either going back to his hotel or going into the observation unit for the night. You recall that we discussed that, I asked you to assume that? Remember that?

A. I remember you asking me that question, yes.

Q. Okay. And you told me that it was -- that would actually be contrary to your recollection; correct?

A. Correct.

Q. In fact, you told me that it was the exact opposite, that you told us in your deposition that you told Mr. Greig you wanted him to stay for further testing; correct?

A. Correct.

Q. And you told us it was Mr. Greig that expressed to you that he did not want to be admitted to the hospital; correct?

A. Correct.

Id. Vol. III at 714-15. According to the trial transcript, Dr. Botros did not waive his arguments regarding the admissibility of Terri Greig's testimony. Dr. Botros was asked to "assume" that it was Terri Greig's understanding that he had offered Michael Greig the option of either going back to his hotel or going into the observation unit for the night. Dr. Botros was not told that Terri Greig testified during deposition that she had learned of this information through McDonald. Because improper hearsay was not admitted through Dr. Botros's testimony, Dr. Botros did not waive the right to object. See Aquila, Inc. v. C.W. Mining, 545 F.3d 1258, 1267 n.5 (10th Cir. 2008) (declining to consider arguments raised for the first time on appeal).

Terri Greig attempts to avoid the hearsay problem by first arguing that the

13

first layer of hearsay, the source of the information provided to McDonald, qualifies for several hearsay exceptions. She argues that "[i]f Mr. McDonald overheard Dr. Botros, or another health care provider acting on behalf of Dr. Botros informing Mr. Greig of his options, then the initial statement fully qualifies as a non-hearsay admission by a party-opponent." Aplt. Br. at 25. According to the Federal Rules of Evidence, party admissions are not hearsay:

> (d)    Statements which are not hearsay. A statement is not hearsay if—
>
> . . . .
>
> (2)    Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject . . . .

Fed. R. Evid. 801(d)(2)(A)-(C). The problem with Terri Greig's argument is that it is only a theory; she does not proffer any support to her argument. McDonald did not testify in deposition or during trial that Michael Greig was given the opportunity to return to his hotel.

Assuming that McDonald knew that Michael Greig was given the opportunity to return to his hotel, the record does not support Terri Greig's argument that the party admission exception applies. Terri Greig does not point to anything in the record that indicates that McDonald "overheard Dr. Botros, or

14

another health care provider acting on behalf of Dr. Botros informing Mr. Greig of his options." Aplt. Br. at 25.

Similarly, Terri Greig does not cite to anything in the record to support her alternate theory as to why the source of McDonald's information would fall under a hearsay exception. She argues that "if Mr. McDonald obtained the initial information through Mr. Greig, Mr. Greig's statement would fall within the 'then existing mental, emotional, or physical condition' hearsay exception pursuant to Federal Rule of Evidence 803(3)." Id. at 26. But the record does not support her theory that McDonald obtained the information from Michael Greig.

Because the source of McDonald's information is hearsay, Terri Greig would not be able to testify regarding whether Michael Greig was offered the opportunity to return to his hotel. See Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). And even if the source of McDonald's information is not hearsay, McDonald's communication of the information to Terri Greig would be hearsay.

Terri Greig also offers two reasons for why her testimony is not hearsay. She first argues that her testimony is not hearsay because she "sought to testify as to her understanding of what Mr. McDonald had learned – not Mr. McDonald's exact 'statements' as proscribed under the hearsay rules." Aplt. Br. at 27. But as the district court noted, "Plaintiff's 'understanding' of the events was based on

15

the statements relayed to her by . . . McDonald. Plaintiff's attempt to camouflage the 'statements' as 'general knowledge held by the Plaintiff' is not persuasive to the Court." Aplt. App. Vol. II at 500-01.

Terri Greig also argues that her testimony is not hearsay because its purpose is to impeach Dr. Botros on the issue of whether Dr. Botros felt that Michael Greig was stable for discharge. However, a witness's character for truthfulness on collateral issues can be attacked only in certain situations that are not applicable here. See Fed. R. Evid. 608; Fed R. Evid. 613 (impeaching a witness with prior inconsistent statements). "A matter is collateral if it could not have been introduced in evidence for any purpose other than for impeachment." Orjias v. Stevenson, 31 F.3d 995, 1008 (10th Cir. 1994) (citing United States v. Walker, 930 F.2d 789, 791 (10th Cir. 1991)). Terri Greig argues that whether Dr. Botros felt that Michael Greig was stable for discharge was central to her case, which is that Dr. Botros failed to take appropriate steps to diagnose Michael Greig's aortic dissection. But whether Dr. Botros had offered Michael Greig the opportunity to leave the hospital is not central to the case because Michael Greig was ultimately admitted to the CDU.

The district court did not err in excluding portions of Terri Greig's testimony.

### D. Cross-Examination of Defense Experts

Terri Greig also argues that the district court erred in precluding her from

cross-examining defense standard of care experts regarding their failure to consider her version of events, which is that Dr. Botros had offered Michael Greig the choice to return to his hotel, in formulating their opinions. Terri Greig argues that "[w]hether or not Mrs. Greig's testimony was inadmissible hearsay at trial bears absolutely no relationship to whether defense experts' apparent choice to not consider her deposition testimony in formulating their opinions was an appropriate matter for cross-examination." Aplt. Br. at 31. Citing the Federal Rules of Evidence, she argues that "experts may offer opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." Id. Because medical experts who testified at trial were allowed to rely upon deposition testimony in formulating their opinions, Terri Greig argues that she should have been allowed to cross-examine Dr. Botros's experts on what deposition testimony they considered.

Terri Greig's argument is not supported by the Federal Rules of Evidence. Rule 703 states in part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Terri Greig's deposition testimony regarding whether Dr. Botros had offered

17

Michael Greig the opportunity to return to his hotel was not the kind of fact upon which experts in the particular field would reasonably rely.

The district court did not allow Terri Greig to cross-examine the defense experts regarding her version of events because "Plaintiff should not be permitted to circumvent the Federal Rules of Evidence by presenting otherwise inadmissible evidence through the cross-examination of an expert witness," and because "Plaintiff was able to cross-examine the experts on that issue based on the medical records, as opposed to Plaintiff's 'understanding.'" Aplt. App. Vol. II at 501-02. The district court did not err in this finding.

Terri Greig also argues that the district court erred in prohibiting Terri Greig from cross-examining Dr. Ogle regarding the impact of Michael Greig's hoarseness. At trial, Terri Greig testified that Michael Greig sounded hoarse when she spoke on the phone with him while he was at the hospital. Terri Greig argues that she

> should have been allowed to cross-examine Dr. Ogle by pointing-out the reference to hoarseness in his report as a sign or symptom associated with aortic dissection, as well as Dr. Ogle's opinion that Mr. Greig was not hoarse, and asking Dr. Ogle whether his opinion that Dr. Botros complied with the applicable standard of care in his treatment of Mr. Greig was changed by Mrs. Greig's testimony that, based upon her own conversation with her husband while he was under Dr. Botros' care at the hospital, Mr. Greig was, in fact, hoarse – or whether he had chosen to ignore Mrs. Greig's testimony in order to support Dr. Botros' care.

18

Aplt. Br. at 38. At trial, the district court precluded Terri Greig from cross-examining Dr. Ogle on this issue:

> There's nothing in the medical records that indicate that Dr. Botros determined or was informed or believed that this patient was hoarse. So for him not to act upon that cannot be a deviation of standard of care.
> . . . .
> My ruling is the hoarseness is not a factor that can be chargeable against this defendant, and so it's not relevant to bring up in this case against this defendant.

Aplt. App. Vol. V at 1438-39.

Although the district court's reading of Michael Greig's medical record is correct in that it does not reflect that Michael Greig sounded hoarse, or that Dr. Botros knew that he was hoarse, there is an even more compelling basis for the court's ruling. As the district court noted in its order for partial summary judgment, Terri Greig "does not reference expert testimony or an expert report which states that the failure to appreciate that hoarseness was consistent with a thoracic aneurysm was a breach or deviation from the standard of care or that it contributed to or caused Greig's death." Id. Vol. I at 88. As a result, whether Michael Greig sounded hoarse is not relevant to the standard of care issue. The district court did not err in prohibiting Terri Greig from cross-examining Dr. Ogle regarding the impact of Michael Greig's hoarseness.

### E.     Dr. Ruth's Testimony

Terri Greig argues that the district court erred in excluding portions of Dr.

19

Richard Ruth's testimony. Dr. Ruth was Terri Greig's expert economist who testified regarding the amount of economic loss, which included "the loss of Mr. Greig's future income, household services loss, loss of care and advice, and loss of parental guidance and care." Aplt. Br. at 50. Dr. Ruth presented a damages calculation based on a full life expectancy, using hypothetical earnings of $30,000 per year, $40,000 per year, and $52,000 per year. He also presented a damages calculation based on an additional 20-year life expectancy using the same hypothetical earnings benchmarks of $30,000, $40,000, and $52,000 per year. At trial, Dr. Botros objected to Dr. Ruth's calculations for a lack of foundation.

After Dr. Ruth presented his damages calculation, and outside the presence of the jury, Dr. Botros argued that Dr. Ruth's calculations lacked foundation. Dr. Botros argued that the $52,000 amount was the salary that Michael Greig had earned in 2006 as a pilot. However, Terri Greig's own medical expert testified that if Michael Greig had undergone surgery for aortic dissection and if he had survived, FAA regulations would have prohibited him from working as a pilot. Dr. Botros also argued that there was no foundation for the use of a normal life expectancy because Terri Greig's medical expert, Dr. Robertson, testified that Michael Greig's life expectancy, if he had undergone surgery and survived, would have been dramatically reduced. Dr. Botros also contended Dr. Ruth's use of the $30,000 and $40,000 hypothetical annual salary earnings because "those are numbers taken, drawn from whole cloth." Aplt. App. Vol. IV at 1188. The

20

district court then ruled to strike Dr. Ruth's testimony regarding income capacity that relates to normal life expectancy. The district court did not strike portions of Dr. Ruth's testimony that relates to the additional 20-year life expectancy. Given the district court's ruling, Terri Greig decided to withdraw Dr. Ruth as a witness altogether.

Terri Greig argues that the district court abused its discretion in striking portions of Dr. Ruth's testimony. Terri Greig argues that Dr. Botros waived his objection to Dr. Ruth's testimony because Dr. Botros did not file any motions challenging Dr. Ruth's testimony prior to trial, nor did Dr. Botros object to Dr. Ruth's loss of income calculations. Aplt. Br. at 56 (citing Nutt v. United States, 335 F.2d 817, 819 (10th Cir. 1964)). Although Dr. Botros did not present any motions objecting to Dr. Ruth's testimony prior to trial, Dr. Botros did object to Dr. Ruth's testimony during trial. See Aplt. App. at 1171 (objecting to Dr. Ruth's of the $52,000 for lack of factual foundation); 1175 (Dr. Botros renewing his objection for calculations based on annual income of $30,000 and $40,000 per year). Based on the record, Dr. Botros did not waive his objections to Dr. Ruth's testimony and opinions.

Terri Greig also argues that Dr. Ruth's opinions were appropriate under Federal Rules of Evidence 702[2] and 703.[3] Terri Greig cites Ramsey v.

---

[2]     If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or

(continued...)

21

Culpepper, 738 F.2d 1092, 1101 (10th Cir. 1984), for the proposition that the underlying validity of an economist's factual assumptions goes to the weight, and not the admissibility, of the evidence. However, Ramsey can be distinguished from this case. In Ramsey, the appellant contended that the district court erred in admitting expert testimony on the issue of damages. Id. at 1100. The expert in that case relied on data already in evidence in making his calculations, and the data was admitted into evidence without objection. Id. at 1101. As the district

---

[2](...continued)
>to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

[3]  The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

court in Ramsey noted, the appellant could not "contend that [the data] are unreliable as a basis for an expert opinion on the question of damages" when the data was admitted into evidence without objection. Id. In addition, the appellant argued that the expert did not have personal familiarity with the underlying data of his opinion. The district court in Ramsey held that "complaints about [the expert's] personal unfamiliarity with . . . the reliability of the figures underlying his opinion go to the weight of his testimony, not to its admissibility." Id. But in this case, there was prior testimony that undercut the $52,000 figure, as Michael Greig would not have been able to work as a commercial pilot even if he had survived the aortic dissection.

In addition, Dr. Ruth does not provide any support for his use of the hypothetical annual income figures. As Dr. Botros argued to the district court, Dr. Ruth "didn't rely upon some Bureau of Labor Statistics or other statistics that courts generally take judicial notice of as a foundation for his opinion." Aplt. App. Vol. IV at 1185. Dr. Ruth's use of the $30,000, $40,000, and $52,000 figures for annual income would not be reasonably relied upon by experts in the field. See Fed. R. Evid. 703. "'[E]xpert[] testimony [regarding future earnings loss] must be accompanied by a sufficient factual foundation before it can be submitted to the jury.'" Elcock v. Kmart Corp., 233 F.3d 734, 754 (3d Cir. 2000) (third alteration in original) (quoting Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983)); see also Benjamin v. Peter's Farm Condominium Owners

23

Ass'n, 820 F.2d 640, 643 (3d Cir. 1987) (holding that the expert's assumption that the injured plaintiff would only make $10,000 a year as a result of sustained injuries lacked sufficient factual predicates). A sufficient factual foundation is absent here.

Terri Greig contends that she was prejudiced by the district court's ruling because striking Dr. Ruth's testimony might have affected Terri Greig's credibility at trial. But exclusion of Dr. Ruth's opinion on damages did not prejudicially affect Terri Greig's substantive rights. See Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1253 (10th Cir. 2005) ("Even if there is an error in the admission or exclusion of evidence, this court will not set aside a jury verdict unless the error prejudicially affects a substantial right of a party."). This court has held that "[t]he effect on the jury is only prejudicial if it can be reasonably concluded that the admission or exclusion made a difference." Id. It cannot be reasonably concluded that the admission or exclusion of Dr. Ruth's testimony made a difference in the outcome of the case. Further, the jury ruled in favor of Dr. Botros, so the jury ultimately did not reach the issue of damages.

The district court did not err in excluding Dr. Ruth's opinion on damages. Even if the district court erred in excluding Dr. Ruth's testimony, the district court's ruling was not prejudicial.

F.     "Best Judgment" Instruction

Terri Greig argues that the district court erred in giving a "best judgment"

24

instruction to the jury.  The district court instructed the jury:

> Where, under the usual practice of the profession of a physician, different courses of treatment are available which might reasonably be used, the physician has a right to use his or her best judgment in the selection of the course of treatment.
>
> However, the selection must be consistent with the skill and care which other physicians practicing in the same field would use in similar circumstances.

Aplt. App. Vol. II at 358.  Terri Greig objected to this jury instruction.  She argued that this was not a "best judgment" case because "there was only one appropriate avenue of treatment available to Dr. Botros that would have met the applicable standard of care: ordering a chest CT scan," and that "[t]he other option – failing to order a CT scan – did not meet the standard of care, and was not a matter of professional judgment."  Aplt. Br. at 46.  The district court disagreed with her argument.  Terri Greig argues that the district court erred for two reasons:

> (1) eliciting this testimony from defense experts was not inconsistent with Mrs. Greig's prevailing theory of the case, and her position as to why the "best judgment" instruction was improper: there was only one reasonable course of treatment – ordering a CT scan; and (2) as Mrs. Greig pointed-out to the Court, this testimony was only elicited from defense experts in response to their affirmative efforts to imply that administering a CT scan may have resulted in damage to Mr. Greig's kidneys due to dye load.

Id. at 47.

25

Terri Greig cites the Kansas Court of Appeals case, <u>Foster ex rel. Foster v. Klaumann</u>, 216 P.3d 671 (Kan. Ct. App. 2009), to support her argument that "when a jury is faced with complex factual issues that must be decided before reaching the ultimate determination of whether a physician breached the standard of care, the 'best judgment' instruction can 'potentially mislead jurors into improperly considering the physician's subjective intent or belief.'"  Aplt. Br. at 48 (quoting <u>Foster</u>, 216 P.3d at 663-64).  Recently, the Kansas Supreme Court reversed the ruling of the Kansas Court of Appeals, finding that "almost all medical malpractice cases require jurors to resolve complex factual issues, so this should not be the determinative criterion."  <u>Foster ex rel. Foster v. Klaumann</u>, 294 P.3d 223, 233 (Kan. 2013).  The "best judgment" jury instruction at issue in <u>Foster</u> was similar to the one given in this case:

> Where, under the usual practice of the profession of the defendant, Michelle Klaumann, M.D., different courses of treatment are available which might reasonably be used, the orthopedic surgeon has a right to use her best judgment in the selection of the choice of treatment.
>
> However, the selection must be consistent with the skill and care which other orthopedic surgeons practicing in the same field of expertise would use in similar circumstances.

<u>Id.</u> at 232 (quotation omitted).

The Kansas Supreme Court concluded that the jury instruction "d[id] not misstate the law because the second paragraph directs the jury to the objective

26

standard of care, clarifying any potential confusion caused by referencing a physician's right to use the doctor's best judgment." Id. at 235. Like the jury instruction given in Foster, the "best judgment" instruction here directed the jury to consider the objective standard of care. Further, the "best judgment" instruction was appropriate under the facts of this case. The jury heard testimony from Terri Greig's medical expert, who testified that the only reasonable course of treatment that would have met the applicable standard of care was a chest CT with contrast. But the jury also heard testimony from Dr. Botros's medical expert, who testified that not ordering a chest CT scan for Michael Greig would have also met the applicable standard of care.

The district court did not err in issuing a "best judgment" jury instruction.

## G. Cumulative Error

Terri Greig argues that she is also entitled to a new trial on the basis of cumulative error. The purpose of cumulative error is to address "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990). "Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors." Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998).

As Terri Greig concedes in her brief, a finding of cumulative error in a civil case is rare. She cites no civil case from this circuit where a new trial has been

27

granted based on a finding of cumulative error. And because the district court in this case did not commit any errors, we need not determine the general applicability of cumulative error analysis in civil cases, because even if applicable it would provide no basis for reversal here. See Frederick v. Swift Transp. Co., 616 F.3d 1074, 1084 (10th Cir. 2010).

## III.  CONCLUSION

Accordingly, we AFFIRM.

Entered for the Court


Mary Beck Briscoe
Chief Judge