NOT DESIGNATED FOR PUBLICATION

No. 122,649

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

EDGAR PEREZ, Individually, and as Next Friend, and
Natural Parent of Minor Child of LINDSAY PEREZ, and as
Administrator of the Estate of LINDSAY PEREZ,
*Appellants*,

v.

WESLEY MEDICAL CENTER, LLC,
*Appellee.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; WILLIAM S. WOOLLEY, judge. Opinion filed January 7, 2022. Affirmed in part, reversed in part, and remanded with directions.

*Bradley J. Prochaska*, *James R. Howell*, and *Michael W. Weber*, of Prochaska, Howell & Prochaska, LLC, of Wichita, for appellants.

*G. Andrew Marino, John H. Gibson,* and *Michelle M. Watson*, of Gibson Watson Marino LLC, of Wichita, for appellee.

Before BRUNS, P.J., GREEN and ISHERWOOD, JJ.

PER CURIAM: This medical malpractice and wrongful death case—which is brought by Edgar Perez—arises from the care and treatment provided to Lindsay Perez after giving birth to their son at Wesley Medical Center, LLC. Lindsay died of pulmonary edema several hours after the baby was delivered by caesarian section. Although several health care providers were initially named as defendants, Wesley Medical Center was the only remaining defendant at the time of trial. After an 11-day trial, the jury returned a

verdict for the plaintiffs and awarded damages in the amount of $6.5 million. Following the trial, the district court reduced the damages to approximately $5.3 million, the amount requested by the plaintiffs in the final pretrial order. Subsequently, the district court granted judgment as a matter of law in favor of Wesley Medical Center and set aside the jury's verdict in its entirety.

On appeal, Perez contends that the district court erred in granting Wesley Medical Center's motion for judgment as a matter of law. In addition, Perez contends that the district court erred in reducing the amount of the damages awarded by the jury. After reviewing the record on appeal in light of Kansas law, we conclude that the district court erred in granting Wesley Medical Center's judgment as a matter of law and setting aside the jury's verdict. Even so, we conclude that the district court did not err in reducing the amount of the damages awarded to conform with the final pretrial order. Thus, we affirm in part, reverse in part, and remand this case to the district court to reinstate the judgment in favor of Perez in the reduced amount previously ordered by the district court.

FACTS

On the night of October 7, 2015, Edgar Perez took his pregnant wife, Lindsay, to Wesley Medical Center. Dr. Holly Montgomery—who at the time was an obstetrics and gynecology resident at Wesley Medical Center—first examined Lindsay and ordered blood tests. Based on her examination of Lindsay, Dr. Montgomery consulted with Dr. Melissa Hodge—who was the "on-call" obstetrician and gynecologist—to report her concerns. In turn, Dr. Hodge requested that a maternal-fetal medicine (MFM) specialist— who provides care for high-risk pregnancies—be consulted.

Dr. Locke Uppendahl—the senior MFM resident—examined Lindsay. Based on Lindsay's elevated blood pressure and other symptoms, Dr. Uppendahl suspected that Lindsay was suffering from severe preeclampsia and recommended immediate delivery

2

of the baby. Around midnight, Dr. Uppendahl called the attending MFM physician, Dr. Margaret O'Hara, to report his findings and recommendation. Dr. O'Hara concurred with Dr. Uppendahl's recommendation and issued orders to induce labor.

Because of signs of potential fetal distress, a caesarian section was eventually ordered. About 4 a.m., the baby was delivered by Dr. Janet Eddy—who was an obstetrics and gynecology resident—under the supervision of Dr. Hodge. During the surgery, Lindsay's blood pressure fell to a level that did not allow for adequate perfusion of her brain and additional IV fluids were given. After delivery, Lindsay had an episode of blindness and could not see her son when he was presented to her. But her vision returned before she was transferred to the high-risk labor and delivery unit for recovery.

Shortly after the baby was delivered, Dr. Hodge and Dr. Robert McKay—who was the anesthesiologist during the caesarian section procedure—discussed whether Lindsay should be sent to recover in the surgical intensive care unit instead of the high-risk labor and delivery unit. Dr. McKay later testified that he

> "thought [Lindsay] was stable from a cardiovascular standpoint. I was a little concerned that she might have had an underlying cardiomyopathy or maybe was developing some pulmonary edema. And so I thought the fastest thing would be to get a chest x-ray and keep her in [the high-risk labor and delivery unit] where they manage the preeclamptic patients routinely, particularly since there are many physicians around [the high-risk labor and delivery unit] to be able to participate in her care as opposed to transferring her to an [intensive care unit] where there are people not really that familiar with preeclampsia."

Because of his concerns that Lindsay might be developing pulmonary edema, Dr. McKay recommended a chest x-ray and a cardiac consultation. Dr. McKay would later testify that he wanted "to see the result of the chest x-ray before I gave Lasix [to treat the possible pulmonary edema]. And, also, since her blood pressure had come back to see if

3

her kidneys had just recovered before we confuse the picture with Lasix." At 5:25 a.m., Dr. Eddy placed an urgent order for a chest x-ray.

Around 6 a.m., Lindsay complained of pain due to a cough. At 6:45 a.m., Lindsay's cough was described as deep and causing significant pain. At 7 a.m., Dr. Uppendahl's shift ended. Before leaving the medical center, Dr. Uppendahl reported to Dr. Rachel Bender—a third year MFM resident—about Lindsay's condition and symptoms. Around the same time, Karen VanEpps, R.N., came on duty and assumed care of Lindsay in the high-risk labor and delivery unit.

At the start of her shift, Nurse VanEpps first completed a head-to-toe physical assessment of Lindsay. In recording her nursing assessment at 7:15 a.m., Nurse VanEpps documented that Lindsay's blood pressure was 182/85, with a heart rate of 88, and a respiratory rate of 22. In addition, she noted crackling sounds in both of Lindsay's lungs, pitting edema in both lower and upper extremities, abdominal pain, fluid retention, shallow breathing, a nonproductive cough, and oxygen saturations greater than 90% with supplemental oxygen being administered.

Nurse VanEpps later testified that her findings during her nursing assessment of Lindsay were concerning. It is undisputed that the protocol at Wesley Medical Center is for nurses to communicate significant information from a nursing assessment to a resident physician, who then passes the information on to the attending physician. After performing her nursing assessment, Nurse VanEpps received a bedside report from the nurse who had been providing Lindsay's care in the high-risk labor and delivery unit. During this discussion, Nurse VanEpps learned a chest x-ray had been ordered but had not yet been performed.

At 7:27 a.m., Nurse VanEpps tried to call the senior obstetrics and gynecology resident to report Lindsay's condition. After being told that the resident was performing a

4

caesarian section, she then spoke to Dr. Bender on the telephone at approximately 7:33 a.m. The evidence about what was said during this conversation is disputed. Although Nurse VanEpps would testify that she reported all the pertinent information she gathered from her initial nursing assessment, Dr. Bender's notes reflect that she simply called to report Lindsay's severely high blood pressure. Noting the pending order for a chest x-ray, Dr. Bender ordered that Procardia—used to treat high blood pressure—be administered.

At trial, Nurse VanEpps testified that she reported the findings from her nursing assessment to Dr. Bender, including the findings consistent with pulmonary edema. In contrast, Dr. Bender testified that Nurse VanEpps told her only about the two severe blood pressure readings during this conversation. Nurse VanEpps testified that she was not surprised that Dr. Bender did not order Lasix for Lindsay after the 7:33 a.m. phone call because Lasix is not commonly given to patients. In her experience, before Lasix is ordered by a physician, there is normally "something that diagnostically told them there was a need for it," such as a chest x-ray showing fluid on the lungs. Nurse VanEpps further testified that at the time, in 2015, in her 13-year career of caring for high-risk obstetrics and gynecology patients, she had been ordered to administer Lasix to only two patients.

At 7:55 a.m., the chest x-ray was taken in Lindsay's room. Around the same time, Nurse VanEpps received a telephone order from Dr. Bender ordering cough drops for Lindsay. At approximately 8:25 a.m., a radiologist reported that the chest x-rays showed pulmonary edema—which is a buildup of fluid in the lungs. Dr. Bender later testified that this "made sense because she is preeclamptic. So the puzzle pieces fit together." Dr. Bender also testified "that was what I was looking for in the chest x-ray—enough information to support giving Lasix."

Dr. Bender then updated Dr. O'Hara and Dr. Byron Cline—Lindsay's regular obstetrician and gynecologist—about Lindsay's respiratory status. She also discussed

5

Lindsay's respiratory status with Dr. Gregory George—the "on call" anesthesiologist—who recommended a pulmonology consult as well as the administration of bilevel positive airway pressure. Around 8:47 a.m., Dr. Bender ordered 40 milligrams of Lasix in an attempt to address Lindsay's fluid retention, and Nurse VanEpps administered the medication.

Around 9:15 a.m., Dr. Bender returned to Lindsay's room to discuss possible transfer to the intensive care unit for airway management. Dr. Bender found Lindsay's condition to have worsened, and she called Dr. George to the room. The record reflects that Lindsay's oxygen saturation levels dropped to the 70s and then to the 50s. In addition, Lindsay's coughing became "frothy," and she became unresponsive. Dr. George called a code blue and CPR was started at 9:23 a.m. Unfortunately, Lindsay was pronounced dead at 10:12 a.m. on the morning of October 8, 2015.

On April 6, 2017, Perez filed this medical malpractice and wrongful death action on behalf of himself, his minor son, and as administrator of Lindsay's estate. Initially, HCA Holdings, Inc., Wesley Medical Center, and nine physicians were named as defendants. Ultimately, all of the defendants except Wesley Medical Center were dismissed from the lawsuit and they are not parties to this appeal.

During discovery, Perez designated Heidi Shinn, R.N., to render opinions about the appropriate standard of care for nurses. In particular, Nurse Shinn opined that Nurse VanEpps breached the appropriate nursing standard of care by failing to timely report all of the signs and symptoms consistent with pulmonary edema to a physician. Perez also designated Baha Sibai, M.D.—a maternal fetal medicine specialist—and Jeffrey Breall, M.D.—a cardiologist—to render opinions on several issues including causation.

Among other things, Dr. Sibai addressed in his report the alleged failure by Nurse VanEpps to timely communicate "that Lindsay's respiratory examination revealed

6

bilateral crackles and other findings of pulmonary edema." In Dr. Sibai's opinion, had Nurse VanEpps reported these symptoms to a physician promptly, "the standard of care would have required treatment be started and said treatment would have saved Lindsay's life." Specifically, Dr. Sibai opined based on "a reasonable degree of medical probability" that the alleged deviation by Nurse VanEpps "did cause or contribute and lead to the ultimate hypoxia, cardiorespiratory arrest and subsequent death of Lindsay Perez from pulmonary edema."

Similarly, Dr. Breall rendered several opinions based on "a reasonable degree of medical probability." These opinions included—but are not limited to—the opinion that if Nurse VanEpps had timely reported that "Lindsay had bilateral crackles, a cough, and the need for 4 [liters] of supplemental Oxygen," then "aggressive treatment for Lindsay's heart failure/pulmonary edema . . . would have saved her life with no change to her life expectancy." Likewise, Dr. Breall rendered the opinion that Lindsay's life expectancy would have been normal for anyone with her attendant co-morbidities once she delivered, assuming she received appropriate treatment.

A final pretrial order was entered by the district court on July 15, 2019. The final pretrial order stated that it "shall supersede all pleadings, shall control the subsequent course of this case, and shall not be modified except by consent of the parties with Court approval, or by order of the court on its own motion to prevent manifest injustice." There is nothing in the record on appeal to suggest that the district court approved any amendments or modifications to the pretrial order following its filing.

Regarding the claim of negligence against Wesley Medical Center, Perez asserted in the final pretrial order that "Nurse VanEpps failed to report all the findings of her 0715 exam that were consistent with Pulmonary Edema." Perez asserted that had she "met the [nursing] standard of care by promptly and properly communicating the patient's signs and symptoms indicative of pulmonary edema to any physician, the [physician's]

7

standard of care would have required immediate treatment for pulmonary edema which would have included, but not limited to, Lasix." Perez also asserted that "[p]rompt and proper treatment would have prevented Lindsay's death." Finally, Perez claimed that had the appropriate standard of care been met, "Lindsay would have survived and lived a normal life expectancy."

The final pretrial order also set forth the amount of damages claimed by Perez. Based on his itemization of economic and noneconomic damages, Perez claimed total damages between $3,476,112 and $5,400,000. Although the final pretrial order stated that Perez "reserves the right to amend the itemization of damages at any time during trial but before the end of the trial," it also provided that this reservation was only applicable "so long as plaintiff does not increase the total amount of damages claimed." Again, there is nothing in the record on appeal to suggest that this provision of the final pretrial order was amended or modified prior to the submission of the case to the jury.

Before trial, the parties filed various motions in limine. In this regard, the parties agreed the expert witnesses should not render new opinions at trial that were not identified in their expert reports previously disclosed under K.S.A. 2019 Supp. 60-226(b)(6). The parties agreed that there should be no reference at trial to contentions of negligence beyond those set forth in the final pretrial order. The parties also agreed that Perez "will have two causation experts (which will be Dr. Breall and Dr. Sibai)."

The district court commenced an 11-day jury trial on July 22, 2019. Extensive evidence was presented by both parties and a full recitation of the testimony is unnecessary to resolve the limited issues presented on appeal. In his case-in-chief, Perez presented the testimony of Nurse Shinn to render opinions about the appropriate nursing standard of care and about the alleged deviations from that standard by Nurse VanEpps. Also, Perez called both Dr. Breall and Dr. Sibai to render opinions about causation within a reasonable degree of medical probability.

8

Nurse Shinn testified that Nurse VanEpps deviated from the appropriate standard of care for nurses by failing to timely report symptoms of pulmonary edema to a physician immediately following the completion of her nursing assessment on the morning of October 8, 2015. Specifically, Nurse Shinn testified that the nursing standard of care required Nurse VanEpps to immediately report to a physician her respiratory findings, the lung crackles, and the imbalance between fluid intake and output. Also, Nurse Shinn opined that Nurse VanEpps' failure to immediately report the signs and symptoms of pulmonary edema to a physician violated hospital policy.

Dr. Breall testified that it is not uncommon to see pulmonary edema in a pregnant woman with severe preeclampsia. He also testified that Lasix is one of the first medications a physician would give when treating a patient for pulmonary edema. Further, Dr. Breall testified that he has routinely ordered Lasix as treatment for patients with pulmonary edema and that the medication generally begins to work within 10 to 15 minutes after it is administered. He also opined that once the Lasix reaches the kidneys, it would "make the fluid go from the lungs to the bladder." According to Dr. Breall, the timely administration of Lasix "can mean the difference between life and death in somebody in whom this fluid is building up in the lungs."

Dr. Breall rendered the opinion that the cause of Lindsay's death was hypoxia as a result of pulmonary edema that resulted from preeclampsia and fluid volume overload. During direct examination, Dr. Breall was asked to "assume" that Nurse VanEpps received an order from a physician to give Lasix around 7:30 a.m. and, if administered by 7:50 a.m.—to account for time to receive the order and administer the medication— would it have saved Lindsay's life. In response, he opined: "[Y]es, it would have prevented her death. If administered at that time, that would have been life saving." Dr. Breall went on to render the opinion that Lindsay's death would have been preventable had treatment for pulmonary edema been started before 8:30 a.m.

9

Dr. Sibai testified that Lindsay had pulmonary edema as a complication of severe preeclampsia, which causes fluid to leak out of the lining of the blood vessels. Dr. Sibai testified about the following symptoms of pulmonary edema observed by Nurse VanEpps during her nursing assessment performed at 7:15 a.m.: shallow breathing, worsening non-productive cough, increased need for oxygen, abnormally low oxygen saturations, high blood pressure readings, pitting edema in the upper and lower extremities, and lung crackles. In Dr. Sibai's opinion, if Lindsay been given Lasix by 7:50 a.m., it "[d]efinitely would have prevented [her] death."

According to Dr. Sibai, Lindsay died as a result of the delay in treating the pulmonary edema with Lasix. In his opinion, Lindsay had an 80% to 90% chance of surviving if Lasix had been given at 7:50 a.m. Dr. Sibai opined a third-year obstetrics resident would be aware of the symptoms of pulmonary edema if reported to them and would possess the knowledge to order Lasix if there is a suspicion of pulmonary edema. Yet Dr. Sibai was not permitted by the district court to expand on his testimony.

Material to the issues on appeal, the record reflects that the following questions were asked by Perez' counsel and that the following answers were given by Dr. Sibai:

"Q. Now, you mentioned pulmonary edema as a medical emergency. Do you treat—do you train residents?
"A. Yes.
"Q. And Dr. Bender was a third-year resident?
"A. Yes.
"Q. And are there second-year and first-year residents?
"A. Yes.
"Q. Would you tell the jury if a resident in the third year is told about the symptoms of pulmonary edema, do they have enough knowledge at the third year to order Lasix?
"A. Yeah. All of them said, you know, if you are suspicious of pulmonary edema you give the Lasix and then call for help, because you have to get the Lasix if there is suspicion of pulmonary edema. So, yeah, that's kind of—

10

"Q. Is that the standard of care?

"A. Yes."

At that point, counsel for Wesley Medical Center interjected:

"[DEFENSE COUNSEL]: Well, excuse me.

"THE COURT: Sustained.

"[PLAINTIFF'S COUNSEL]: I said as a physician, not a nurse, Judge.

"[DEFENSE COUNSEL]: Same difference.

"[PLAINTIFF'S COUNSEL]: It goes to causation.

"[DEFENSE COUNSEL]: No.

"THE COURT: No, that was a standard of care question."

At the close of Perez' case in chief, Wesley Medical Center moved for judgment as a matter of law. In particular, the medical center claimed that Perez failed to present sufficient evidence to establish a causal connection between the alleged nursing malpractice and Lindsay's death. The district court took the motion under advisement and Wesley Medical Center renewed its motion before it rested. Again, the district court took the motion for judgment as a matter of law under advisement and ultimately submitted the case to the jury.

After deliberation, the jury returned a verdict in favor of Perez and against Wesley Medical Center in the amount of $6.5 million. Following the trial, the medical center filed a "Motion to Reduce Non-Economic Damages Award and Motion to Enforce the Pretrial Order." While the motion for judgment as a matter of law was still pending, the district court granted the motion to reduce the amount of damages in part and denied it in part. Relying on the itemization in the final pretrial order, the district court reduced the amount of damages to $5,370,832.

On December 27, 2019, the district court granted Wesley Medical Center's motion for judgment as a matter of law and set aside the jury's verdict in its entirety. The district

11

court determined that "there is no evidence on what Dr. Bender would have done differently with the 7:15 a.m. chart information in time to prevent Lindsay's death." The district court then found "that if there is no evidence of what Dr. Bender would or should have done differently, if she had the [information from the] 7:15 a.m. assessment, then Plaintiffs have not met their burden of proving the lack of the information led to a failure to immediately diagnose severe pulmonary edema and the failure to immediately order Lasix." Later, on January 10, 2020, the district court entered a final judgment in favor of Wesley Medical Center and dismissed Perez' claims.

Thereafter, Perez filed a timely notice of appeal.

ANALYSIS

*Issues Presented*

Although the parties phrase the issues presented in this appeal differently, there are two primary issues: first, whether the district court erred in granting judgment as a matter of law in favor of Wesley Medical Center after the jury trial; and, second, if the district court did err in granting judgment as a matter of law in favor of Wesley Medical Center, whether the district court also erred in reducing the amount of the damages awarded by the jury to Perez.

*Motion for Judgment as a Matter of Law*

Motions for judgment as a matter of law—formerly known as motions for directed verdict—are governed by K.S.A. 2020 Supp. 60-250(a)(1), which allows a district court to enter judgment against a party on a claim or defense that has been fully presented to a jury if there is not "a legally sufficient evidentiary basis to find for the party on that issue . . . ." On appeal, our review of a district court's ruling on a motion for judgment as a matter of law is unlimited. In deciding whether the district court erred, we must review

12

the record on appeal to determine "whether evidence existed from which a reasonable jury 'could properly find a verdict for the nonmoving party.'" *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015).

Similar to our review of a district court's ruling on a motion for summary judgment, we must resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party—in this case Perez—against whom the ruling was sought. When reasonable minds could reach different conclusions based on the evidence, a motion for judgment as a matter of law must be denied. 301 Kan. at 766. In other words, a motion for judgment as a matter of law must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party. *Bussman v. Safeco Ins. Co.*, 298 Kan. 700, 707, 317 P.3d 70 (2014).

Here, Wesley Medical Center timely moved for judgment as a matter of law under K.S.A. 2019 Supp. 60-250(a) at the close of Perez' case-in-chief. The district court took the motion under advisement and ultimately allowed the case to be submitted to the jury. After the jury reached its verdict, Wesley Medical Center renewed its motion for judgment as a matter of law under K.S.A. 2019 Supp. 60-250(b). While the motion for judgment as a matter of law was still under advisement, the district court reduced the amount of damages from the $6.5 million awarded by the jury to $5,370,832 based on the amount claimed by Perez in the final pretrial order.

On December 27, 2019, the district court filed its memorandum decision granting Wesley Medical Center's motion for judgment as a matter of law. This ruling effectively set aside the jury's verdict in its entirety and the district court later entered an order dismissing Perez' claims. On appeal, Perez seeks to have the jury's verdict reinstated. In response, Wesley Medical Center asks that we affirm the district court's decision on the motion for judgment as a matter of law or—in the alternative—remand this case to the district court for a new trial.

13

It is undisputed that any liability on the part of Wesley Medical Center in this case would be vicarious based on the alleged negligence of Nurse VanEpps. See *Bates v. Dodge City Healthcare Grp., L.P.*, 296 Kan. 271, 290, 291 P.3d 1042 (2013); *West v. Collins*, 251 Kan. 657, 664-65, 840 P.2d 435 (1992) ("Vicarious liability is a term generally applied to legal liability which arises solely because of a relationship and not because of any act of negligence by the person held vicariously liable for the act of another."). Under Kansas law, a nurse is "a person who works in the same area as and under the supervision of a physician or other practitioner of the healing arts." *State Bd. Of Nursing v. Ruebke*, 259 Kan. 599, 627, 913 P.2d 142 (1996). "A nurse is not a practitioner of the healing arts. K.S.A. 65-2872(m)." *Nold ex rel. Nold v. Binyon*, 272 Kan. 87, 100-01, 31 P.3d 274 (2001).

To prevail against Wesley Medical Center, Perez was required to establish:  (1) that Nurse VanEpps owed the patient a duty of care; (2) that Nurse VanEpps deviated from the appropriate standard of care; (3) that the patient was injured; and (4) that the injury or death was proximately caused by Nurse VanEpps' deviation from the appropriate standard of care. *Puckett v. Mt. Carmel Reg'l Med. Ctr.*, 290 Kan. 406, 420, 228 P.3d 1048 (2010). At trial, Perez bore the burden of proving each of these elements by a preponderance of the evidence. See 290 Kan. at 420. Unless the deviation from the appropriate standard of care or the existence of causation falls within the common knowledge or experience of an average layperson, expert testimony is required to establish both the accepted standard of care and causation. See *Russell v. May*, 306 Kan. 1058, 1071, 400 P.3d 647 (2017); *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988). In addition, the expert opinions should be confined to matters within a reasonable degree of probability rather than mere possibility. See *Kuxhausen v. Tillman*, 291 Kan. 314, 318, 241 P.3d 75 (2010); *Sharples v. Roberts*, 249 Kan. 286, 292, 816 P.2d 390 (1991); *Stormont-Vail Healthcare, Inc. v. Cutrer*, 39 Kan. App. 2d 1, Syl. ¶ 4, 178 P.3d 35 (2007).

14

On appeal, Wesley Medical Center does not dispute that Perez presented substantial evidence to support the first three factors to establish nursing malpractice. Instead, the only element at issue on appeal is whether Perez presented substantial evidence from which a reasonable jury could find that the alleged deviation from the appropriate standard of care by Nurse VanEpps proximately caused Lindsay's injuries or death. Causation is normally a question of fact left to a jury to decide. *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, Syl. ¶ 13, 261 P.3d 943 (2011).

In Kansas, "proximate cause" has been defined to mean a natural and continuous sequence of events that produces an injury. Hence, the injury suffered must be the natural and probable consequence of the wrongful act or omission. *Puckett*, 290 Kan. at 420 (quoting *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 499, 173 P.3d 642 [2007]). This definition of proximate cause incorporates two concepts—causation in fact and legal causation. "Causation in fact means a cause-and-effect relationship exists between a party's conduct and the resulting harm. Legal causation means a party's conduct might foreseeably create a risk of harm and cause or contribute to the resulting harm." *Montgomery v. Saleh*, 311 Kan. 649, 659, 466 P.3d 902 (2020) (citing *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 623, 345 P.3d 281 [2015]).

In *Burnette v. Eubanks*, 308 Kan. 838, 846, 425 P.3d 343 (2018), the Kansas Supreme Court explained:

> "'To establish causation in fact, a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury can conclude that more likely than not, but for defendant's conduct, the plaintiff's injuries would not have occurred. To prove legal causation, the plaintiff must show it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes was foreseeable.' [Citation omitted.]"

15

An injury is foreseeable where one who owes a duty of care knows or reasonably should know that an action or a failure to act will likely result in harm to another. See *Castleberry v. DeBrot*, 308 Kan. 791, 802-03, 424 P.3d 495 (2018); *Shirley v. Glass*, 297 Kan. 888, 900, 308 P.3d 1 (2013) (citing *South v. McCarter*, 280 Kan. 85, 103-04, 119 P.3d 1 [2005]). Although proximate cause may not be presumed from the mere fact of injury, whether a risk of harm is reasonably foreseeable is usually a question of fact to be decided by the jury. Consequently, the question of foreseeability should not be decided as a matter of law except in a case in which a reasonable person could arrive at only one conclusion based on the evidence. *Puckett*, 290 Kan. at 434.

Here, Perez presented a nursing expert at trial who testified that Nurse VanEpps deviated from the appropriate standard of care for nurses by failing to timely report to a physician all the information she had obtained from performing her initial nursing assessment of Lindsay's condition on the morning of October 8, 2015. In particular, the nursing expert testified that the appropriate standard of care for nurses—as well as Wesley Medical Center's own policy—required Nurse VanEpps to immediately report to a physician her respiratory findings, the lung crackles, and the imbalance between fluid intake and output. Although the nursing expert appropriately recognized that nurses do not make medical diagnoses, she testified that the symptoms noted by Nurse VanEpps in her initial nursing assessment of Lindsay are recognized as symptoms pointing to possible pulmonary edema.

When asked how—in her opinion—Nurse VanEpps violated the appropriate standard of care for nurses, Perez' nursing expert responded:

>"By failing to report signs and symptoms that were consistent with pulmonary edema, either using the words pulmonary edema or specifically [reporting] the respiratory findings and the fluid . . . intake and output findings that were consistent with that diagnosis of pulmonary edema. While nurses don't make clinical diagnoses, they can make something called a nursing diagnosis. And they can report those findings after

they've collected all this data, which they are actually in a very unique position being at the front line as the safety net, as the data collectors to then report those findings to the physician timely."

In granting Wesley Medical Center's motion for judgment as a matter of law, the district court found it significant that Dr. Bender was not asked "whether she would have diagnosed pulmonary edema, much less severe pulmonary edema, just from the 7:15 a.m. assessment information in the chart." Likewise, the district court found it significant that Dr. Bender was not asked during her deposition "what she would have done, what she could have done, or what she would have been required to do if Nurse VanEpps had given her all the allegedly missing information during the 7:33 a.m. report." Of course, the material question is not what Dr. Bender would or would not have done but—as the district court instructed the jury in jury instruction No. 4—whether there was evidence presented at trial from which a reasonable jury could properly find that had Nurse VanEpps met the appropriate "standard of care by promptly and properly communicating Lindsay Perez's signs and symptoms indicative of pulmonary edema to *any physician*, Lasix would have been administered and would have prevented Lindsay's death." (Emphasis added.)

Resolving all facts and inferences reasonably drawn from the evidence in favor of the plaintiff as we are required to do, we conclude that the record contains evidence upon which a jury could have found support in favor of Perez on the issue of causation. Specifically, we find evidence in the record on appeal to support the following:

- During her nursing assessment conducted at 7:15 a.m., Nurse VanEpps recorded Lindsay's symptoms as:  high blood pressure, pitting edema, bilateral lung crackles, fluid overload, and the need for oxygen.

17

- Nurse Shinn, Dr. Breall, and Dr. Sibai each testified that the symptoms noted by Nurse VanEpps during the performance of her 7:15 a.m. nursing assessment were consistent with pulmonary edema.

- Nurse Shinn—who testified as an expert witness on behalf of Perez at trial—rendered the opinion within a reasonable degree of probability that Nurse VanEpps violated the appropriate nursing standard of care "[b]y failing to report signs and symptoms that were consistent with pulmonary edema, either using the words pulmonary edema or specifically the respiratory findings and the fluid . . . intake and output findings that were consistent with that diagnosis of pulmonary edema."

- Nurse Shinn also testified that the symptoms recorded by Nurse VanEpps during her initial nursing assessment of Lindsay were consistent with possible pulmonary edema.

- In Dr. Bender's deposition—a portion of which was read to the jury because she was living in Florida at the time of trial—she testified that she was a third-year MFM resident at the time of Lindsay's hospitalization.

- Dr. Bender testified that Nurse VanEpps paged her at approximately 7:30 a.m. and that she immediately responded by telephone.

- According to Dr. Bender, her initial phone conversation with Nurse VanEpps around 7:33 a.m. "was very routine" and primarily involved the nurse reporting that Lindsay had elevated blood pressures. In an attempt to control Lindsay's blood pressure, Dr. Bender ordered that Procardia be administered.

- Dr. Bender further testified that Nurse VanEpps contacted her again around 8:26 a.m. Dr. Bender recalled that Nurse VanEpps told her that she was concerned about Lindsay's respiratory status and that there were still no results from radiology regarding a chest x-ray that had been taken at 7:55 a.m.

- Dr. Bender testified after receiving the additional information from Nurse VanEpps about Lindsay's respiratory status at 8:26 a.m., she considered it to be an emergent issue and headed to the hospital from her office across the street.

- Also, Dr. Bender testified that she called radiology while she was walking from her office to the medical center and was told the chest x-ray showed probable pulmonary edema.

- After calling her attending physician to confirm, Dr. Bender ordered Lasix and it was administered at 8:47 a.m.

- It does not appear from the record that Nurse VanEpps talked to any other physician about Lindsay's case during the time between her first and second phone conversations with Dr. Bender.

- Dr. Breall—who served as one of Perez' causation experts—testified that in his opinion it would take a doctor about 10 or 15 minutes to "do a reasonable examination" of a patient and "come up with a preliminary diagnosis" of pulmonary edema.

- Dr. Breall rendered the opinion that "[t]here's no question in [his] mind" that Lindsay was showing signs and symptoms consistent with pulmonary edema at 7:15 a.m., and the appropriate treatment would be the administration of Lasix, which is "a medicine that will help [the patient] excrete that fluid." If timely treatment is not administered and the patient continues to receive fluids, then the "fluid ends up in the lungs and it ends up in the peripheral tissues."

- Dr. Breall further opined that "[t]here's no question" that Lindsay's death was preventable had she been timely treated with Lasix.

- Dr. Breall rendered the opinion that he is 95% certain that if Lasix had been administered by 8 a.m., Lindsay would have survived.

- In addition, Dr. Breall opined that even if Lasix had been given by 8:30 a.m., it is likely that Lindsay would have survived.
- Dr. Sibai—who served as Perez' other causation expert witness—testified that in his opinion, Lindsay was showing many symptoms of pulmonary edema by 7:15 a.m. After going through the examination notes on Lindsay's chart after Nurse VanEpps' 7:15 a.m. assessment, Dr. Sibai testified that "definitely she has congestive heart failure and pulmonary edema [] putting all the picture together."
- Dr. Sibai also opined that pulmonary edema should be considered a medical emergency.
- Dr. Sibai rendered the opinion that Lindsay's death "definitely" was preventable.
- Dr. Sibai testified that he had administered Lasix in the treatment of patients with high-risk pregnancies 200 or more times.
- Dr. Sibai rendered the opinion that third-year residents have sufficient knowledge to recognize that Lasix should be given if they are suspicious of pulmonary edema.
- Dr. Sibai went on to opine that this is the standard of care.
- Dr. Sibai testified that if Lasix had been given by 7:50 a.m., Lindsay would have had an 80% to 90% likelihood of surviving.
- Also, Dr. Sibai opined that Lindsay's life could have been saved if Lasix had been started by 8:30 a.m.

Notwithstanding, Wesley Medical Center suggests that Dr. Sibai's testimony regarding what a third-year obstetrics' resident would know about the administration of Lasix to treat suspected pulmonary edema was not in evidence because the district court sustained a purported objection to this testimony. However, a review of the trial transcript—which is the official record of the proceedings—reveals that the purported

20

objection was not made until after Dr. Sibai had answered the question about the knowledge of third-year residents. In fact, the purported objection was not made until after Dr. Sibai had answered the next question.

Specifically, the trial transcript shows that the following occurred:

"Q. Now, you mentioned pulmonary edema as a medical emergency. Do you treat—do you train residents?
"A. Yes.
"Q. And Dr. Bender was a third-year resident?
"A. Yes.
"Q. And are there second-year and first-year residents?
"A. Yes.
"Q. Would you tell the jury if a resident in the third year is told about the symptoms of pulmonary edema, do they have enough knowledge at the third year to order Lasix?
"A. Yeah. All of them said, you know, if you are suspicious of pulmonary edema you give the Lasix and then call for help, because you have to get the Lasix if there is suspicion of pulmonary edema. So, yeah, that's kind of—
"Q. Is that the standard of care?
"A. Yes.
"[DEFENSE COUNSEL]:  Well, excuse me.
"THE COURT:  Sustained."

Even if we assume that the answer was given so quickly that defense counsel did not have time to object, a motion to strike would have been the appropriate remedy. See *State v. Campbell*, 268 Kan. 529, 538, 997 P.2d 726 (2000); see 3 Hayden, Kansas Law and Practice:  Lawyer's Guide to Evidence § 1:13 (5th ed. 2021) (if objection is sustained, a motion to strike should be made as to any testimony presented which would not be admissible as a result of the ruling). Although counsel for Wesley Medical Center suggested during oral argument before this court that the jury instructions given by the court at the end of the trial functioned as an order to strike, we have reviewed the instructions and find nothing striking this testimony. The district court did give a standard

21

instruction indicating generically that it had "ruled upon objections to the admission of evidence" and that the jury "must consider only the evidence which is admitted. " Here, we find that the evidence quoted above was admitted and was properly before the jury for consideration.

In particular, we do not find that defense counsel's "excuse me" statement is adequate to meet the requirement of a clear and specific ground of objection to evidence as required under Kansas law. See K.S.A. 60-404; see also *City of Overland Park v. Cunningham*, 253 Kan. 765, 772, 861 P.2d 1316 (1993) ("[A] contemporaneous objection must be made and it should be specific enough that the trial judge can rule intelligently upon the objection, and the specific contemporaneous objection must be made known to the opposing counsel when the objection is lodged."). Even when evidence is challenged prior to trial by a motion in limine, a timely and specific objection must still be made at trial. *Adamson v. Bicknell*, 295 Kan. 879, 894, 287 P.3d 274 (2012). As our Supreme Court has explained, "a pretrial objection by itself is not timely because the evidence may be . . . viewed differently by the judge in the context of all of the evidence and argument heard at trial." *State v. Kelly*, 295 Kan. 587, 590, 285 P.3d 1026 (2012). Thus, we find that this evidence was properly before the jury for consideration.

Wesley Medical Center also contends that it was entitled to judgment as a matter of law because Perez failed to prove that Dr. Bender would have changed her course of treatment if she had been properly informed that Lindsay was showing signs of pulmonary edema. In support of this contention, the medical center cites *Drouhard-Nordhus*, 301 Kan. 618. In *Drouhard-Nordhus*, the plaintiff claimed that a radiologist committed medical malpractice for allegedly misinterpreting a CT scan. In that case, the plaintiff failed to come forward with sufficient evidence to establish that subsequent healthcare providers relied on the alleged flawed interpretation in providing care and treatment to the plaintiff. As a result, the district court granted summary judgment in favor of the radiologist.

22

In affirming the district court's decision to grant summary judgment, the Kansas Supreme Court found that the testimony of an expert witness "may be sufficient to establish that a different evaluation would have resulted in a different diagnostic test . . . . But to establish the final link in the causation chain, plaintiff must show that those tests would have resulted in a treatment that would have prevented Drouhard's death." 301 Kan. at 624. See also *Emerson v. Macy*, No. 93,867, 2006 WL 2337216, at *4-6 (Kan. App. 2006) (unpublished opinion) (nurse's alleged failure to call a surgeon in a timely manner to notify him of a patient's post-operative complications did not cause the patient's death because the surgeon testified that he would not have acted had he been told of the patient's condition at the time).

We find both *Drouhard-Nordhus* and *Emerson* to be distinguishable from the present appeal. Unlike those cases, a review of the record in this case reveals that there was expert testimony that—if believed—was sufficient to establish a causal link between the alleged failure of Nurse VanEpps to promptly and/or fully inform Dr. Bender or another physician about Lindsay's condition immediately following her 7:15 a.m. nursing assessment and the timely administration of Lasix to treat for suspicion of pulmonary edema. In turn, we find that there is expert testimony in the record that—if believed—is sufficient to establish within a reasonable degree of probability that the timely administration of Lasix would have saved Lindsay's life. Unlike *Drouhard-Nordhus* and *Emerson*, we do not find that it was appropriate under the circumstances presented here for the district court to take the decision regarding fault out of the hands of the jury.

Based on the evidence in the record—as well as the rational inferences that could be drawn from the evidence—in the light most favorable to Perez, we find that the jury could have reasonably concluded that Nurse VanEpps failed to immediately report all the symptoms she noted during her 7:15 a.m. nursing assessment of Lindsay to Dr. Bender or any other physician. Although there is conflicting evidence in the record as to what Nurse VanEpps told Dr. Bender during the 7:33 a.m. phone call, we recognize that this was a

23

question for the jury to decide. We also find that the jury could have reasonably concluded that the symptoms of high blood pressure, pitting edema, bilateral lung crackles, fluid overload, and the need for oxygen charted by Nurse VanEpps are consistent with pulmonary edema. Furthermore, we find that the jury could have reasonably concluded that Dr. Bender or any other physician under the same or similar circumstances would have ordered that Lindsay be given Lasix for suspicion of pulmonary edema had they been promptly and fully informed of the symptoms noted by Nurse VanEpps during her initial nursing assessment. Finally, we find that the jury could have reasonably concluded that Lindsay would have survived had Lasix been timely administered.

As discussed above, a motion for judgment as a matter of law must be denied when there is evidence in the record upon which a reasonable jury could find in favor of the nonmoving party. *Bussman*, 298 Kan. at 707. Similarly, the question of causation is generally a question of fact and only becomes a question of law if "'all the evidence on which a party relies is undisputed and susceptible of only one inference.'" *Burnette*, 308 Kan. at 846. We do not find that to be the situation in this case. Instead, based on our review of the record, we find that the evidence—although hotly contested—was adequate to support the jury's verdict on the issue of fault including both negligence and causation. Thus, we conclude that the district court erred in granting Wesley Medical Center's motion for judgment as a matter of law under the circumstances presented.

*Motion to Reduce Non-Economic Damages Award and Enforce Pretrial Order*

Perez also contends that the district court erred when it granted Wesley Medical Center's posttrial "Motion to Reduce Non-Economic Damages Award and Motion to Enforce the Pretrial Order." We review a district court's decision on a motion to alter or amend a judgment—which would include a motion to reduce the amount of judgment—under an abuse of discretion standard. See *Exploration Place, Inc. v. Midwest Drywall*

24

*Co.*, 277 Kan. 898, 900, 89 P.3d 536 (2004); *Wenrich v. Employers Mutual Insurance Co.*, 35 Kan. App. 2d 582, 585-86, 132 P.3d 970 (2006). A judicial action constitutes an abuse of discretion only if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). The party asserting the district court abused its discretion—in this instance Perez—bears the burden of showing such an abuse of discretion. *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

After the jury returned a verdict awarding $6.5 million in damages, Wesley Medical Center moved to reduce the amount of the award. In support of its motion, the medical center raised several arguments. Significant to this appeal, it argued that the verdict should be reduced to the amount requested in the final pretrial order. In granting the motion in part and denying it in part, the district court determined that the final pretrial order was binding on the parties "unless a motion is made to modify it." Accordingly, the district court reduced the amount of the verdict to $5,370,832 as requested in the final pretrial order entered on July 15, 2019.

We pause to note that the district court denied the part of the motion in which Wesley Medical Center sought to have the damages awarded reduced in accordance with the statutory caps on damages. The district court ruled that the Kansas Supreme Court's holding in *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1149-50, 442 P.3d 509 (2019), applied to medical malpractice cases and that the limitation on damages in wrongful death cases under K.S.A. 60-1903 was unconstitutional. Because Wesley Medical Center has not filed a cross-appeal from this ruling, this issue is not before us for resolution. See K.S.A. 2020 Supp. 60-2103(h).

Although the parties discuss Kansas Supreme Court Rule 118 (2021 Kan. S. Ct. R. 205) in their briefs, the district court's ruling on the motion to reduce was based on the provisions of the final pretrial order rather than the rule. A review of the record reflects

that the final pretrial order was agreed to by the parties before it was executed and filed by the district court. Consistent with K.S.A. 2020 Supp. 60-216(d), the final pretrial order entered by the district court in this case expressly stated that it "shall supersede all pleadings, shall control the subsequent course of this case and shall not be modified except by consent of the parties with Court approval, or by order of the Court on its own motion to prevent manifest injustice."

The purpose of a final pretrial order is to eliminate surprise at trial by fully disclosing to all parties the anticipated evidence and legal issues. See *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 708, 317 P.3d 70 (2014). Here, the final pretrial order entered by the district court set forth an itemized list of the damages claimed by Perez. Still, the final pretrial order also states that Perez only reserved the right to amend the itemization of damages prior to the end of the trial "so long as plaintiff does not increase the total amount of damages claimed."

At no time did Perez request to amend the final pretrial order to exceed the total amount of damages set forth in the order. Instead, the record reflects that Perez expressly represented to the district court at a motions hearing held prior to the presentation of evidence at trial that he would not be asking the jury to award more damages than those requested in the final pretrial order. Because the final pretrial order was not subsequently modified by—or with the approval of—the district court, the parties were bound by its terms absent a showing of manifest injustice. See K.S.A. 2020 Supp. 60-216(e); *Cerretti v. Flint Hills Rural Elec. Co-op Ass'n*, 251 Kan. 347, 361, 837 P.2d 330 (1992); *Ettus v. Orkin Exterminating Co., Inc.*, 233 Kan. 555, 561, 665 P.2d 730 (1983); *Smith v. Oliver Heights*, 49 Kan. App. 2d 384, 391-92, 311 P.3d 1139 (2013).

Perez suggests that the district court's enforcement of the final pretrial order may be unconstitutional because a jury is entitled to determine the amount of damages—if any—to be awarded in a civil trial under Section 5 of the Bill of Rights of the Kansas

26

Constitution. Although Perez cites K.S.A. 2020 Supp. 60-238 and *Hilburn*, we find that neither support his argument. In particular, neither K.S.A. 2020 Supp. 60-238 nor *Hilburn* stand for the proposition that holding a party to the terms of a final pretrial order—especially one that is agreed upon by the parties—is unconstitutional.

Perez also suggests that K.S.A. 2020 Supp. 60-254(c) supports his position that the district court erred in enforcing the terms of the final pretrial order. As the statute—which addresses default judgments—states on its face, "[e]very other final judgment should grant relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Here, the issue before us is not whether Perez could assert a claim for relief above the amount of damages demanded in his pleadings. Rather, the issue is whether Perez should be held to the amount of damages that was included in the final pretrial order issued by the district court. As our Supreme Court has held, "[u]nder notice pleading, the petition is not intended to govern the entire course of the case. Rather, the pretrial order is the ultimate determinant as to the legal issues and theories on which the case will be decided. *Halley v. Barnabe*, 271 Kan. 652, 656-57, 24 P.3d 140 (2001)." *Unruh v. Purina Mills, LLC*, 289 Kan. 1185, 1191, 221 P.3d 1130 (2009).

We conclude that pretrial orders are important tools for district courts to perform their duties in a way that ensures that the parties receive a fair trial. The purpose of a pretrial order is to define and clarify the issues in order to reduce—if not eliminate—surprise during trial. *Bussman*, 298 Kan. at 708. Under K.S.A. 2020 Supp. 60-216, a pretrial order entered by the district court is a binding order that controls the subsequent proceedings unless modified to prevent manifest injustice. Thus, based on our review of the record, we conclude that the district court properly exercised its discretion by granting Wesley Medical Center's motion and reducing the amount of the jury's verdict to the amount claimed in the final pretrial order.

27

CONCLUSION

After reviewing the record on appeal in a light most favorable to Perez, we conclude that the district court erred in granting Wesley Medical Center's judgment as a matter of law under K.S.A. 2020 Supp. 60-250(a)(1). More specifically, we find that the record reflects a legally sufficient evidentiary basis to support the jury's verdict regarding the alleged fault of the medical center. In particular, we find that there is evidence on the issue of causation from which the jury could conclude within a reasonable degree of probability that the acts or omissions of Nurse VanEpps—for whom Wesley Medical Center is vicariously liable—caused or contributed to Lindsay Perez' injuries and death.

However, we do not find that the district court abused its discretion in reducing the amount of the damages awarded to Perez to conform with the amount claimed in the final pretrial order. Furthermore, it is not necessary for us to consider the other issues addressed by the parties in their briefs. We, therefore, affirm in part, reverse in part, and remand this case to the district court to reinstate the judgment in favor of Perez in the amount of $5,370,832.

Affirmed in part, reversed in part, and remanded with directions.

28